Belknap,
June 3, 1930.

LLOYD W. DUNLAP *v.* WALTER E. DUNLAP.

*Fortunat E. Normandin* and *Owen & Veazey* (*Mr. Owen* orally), for the plaintiff.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the defendant.

PEASLEE, C. J. I. The case is presented here in part upon evidence produced at the trial and in part upon offers of proof. At the close of the testimony, the motion for a nonsuit was made and the plaintiff was permitted to make the first offer of additional proof. The motion was then granted subject to exception. About a week later, the plaintiff was given leave to make a further offer of proof. The defendant excepted, and now claims that the last offer of proof cannot be considered here. The objection is not well taken. The case was still within the control of the superior court, and there was discretionary power to reopen it to receive the offer of added proof. *Wells* v. *Burbank*, 17 N. H. 393, 412.

II. Authority for the denial of liability is sought to be found in the law forbidding suits between husband and wife. It is said that the uniform holding that legislative action removing common-law disabilities is required there shows that it is also required here. The fallacy in the argument lies in the failure to properly differentiate the two relations, as they existed at common law. By that law there was a legal unity of husband and wife. "By the common law, the married woman's contracts were absolutely void,—not merely voidable, like those of infants and lunatics; and this, not because of the theory that, like an infant or a lunatic, she required the protection of the law, . . . but because of the theory of the utter absorption of the existence of the wife in that of the husband; or the other theory, of her subjection and slavery." *Harris* v. *Webster*, 58 N. H. 481, 482.

It is not necessary to go further than to contrast this doctrine of "a legal unit," forbidding all contracts or suits between husband

and wife (*Clough* v. *Russell*, 55 N. H. 279), with the rule that a minor may make a contract with his father and sue thereon (*Hall* v. *Hall*, 44 N. H. 293), to demonstrate the fundamental difference in the legal theories as to the nature of the respective relations. "There is no conception of unity of legal identity of parent and minor child." 43 Harv. Law Review, 1056.

There never has been a common-law rule that a child could not sue its parent. It is a misapprehension of the situation to start with that idea, and to treat the suits which have been allowed as exceptions to a general rule. The minor has the same right to redress for wrongs as any other individuals. In the investigation of the subject, the starting point is a general right to demand reparation. The limitations which have been put upon that right have been deduced from prevalent ideas touching family life, and especially parental rights and duties. And here, as one distinguished writer has put it, we "are in the realm of belief and emotion." 43 Harv. Law Review, 1076. Opposing views have not infrequently been advocated with rhetoric rather than by reason. Out of it all there emerges one substantial and reasonable ground for denying a recovery, and one only. The parental authority should be so far supreme that whatever would unduly impair it should be foregone by the child for his ultimate good.

In so far as the idea of maintenance of the family peace is concerned, it has been determined for this jurisdiction that it is not always a ground for refusing recovery for torts. After our statute had removed the fiction of legal unity of husband and wife, it was held that she might sue him for an assault. *Gilman* v. *Gilman*, 78 N. H. 4. It is manifest that this action would be as disruptive of family peace as one between parent and child. For this reason the right of the emancipated wife to maintain it is denied in many jurisdictions; while in a few the inconsistent conclusions have been reached that she could sue, but the child could not. 43 Harv. Law Rev. 1075.

It may be said that the conclusion reached in *Gilman* v. *Gilman*, *supra*, was put upon the ground that the language of the statute plainly indicated a legislative intent to declare that the action could be maintained. But this does not help the defendant. If a mandate to disregard the argument as to family peace is found in a legislative enactment rather than in a judicial view of the common law, it is still more important. Judicial decisions may be overruled, but statutes must be obeyed.

"By 'public policy' is intended the policy of the state as evidenced by its laws." *Spead* v. *Tomlinson*, 73 N. H. 46, 58. The legislature has enacted a statute which is a plain repudiation of the idea that it is the policy of the state that maintenance of tort suits within the family circle should be forbidden. Of course this does not indicate any view as to reasons based upon other particular relations. It expresses no opinion as to maintenance of discipline over children. But as to reasons equally applicable to parent and child and husband and wife, it is a declaration of policy which should not be ignored. Even if the family peace argument against tort actions by the child is not to be considered to have been wholly repudiated by the statute plus its interpretation in *Gilman* v. *Gilman, supra,* the law there announced is at least of significance upon the issue of the policy to be followed in similar situations. The argument being that there is a state policy to maintain domestic peace by denying tort actions within the family, anything which tends to prove the absence of such general policy must be considered in solving the issue of the existence of the policy, when it is invoked in a particular instance.

But if it be conceded that the family peace idea is still available here as a reason for denying liability, so far as it ever had any force, it remains to inquire as to the source and present scope of the alleged immunity granted to the parent, for the enforcement of discipline and the preservation of family accord.

There is much to be said in support of the contention that the whole theory of non-liability effected through a rule of incapacity to sue is unsound. Cases of mere non-feasance as to the performance of moral duties of support, etc., are not in point here. There is no liability because there has been no breach of a legal duty. So too suits for excessive punishment, not maliciously inflicted, are to be distinguished because of the qualified privilege attached to the performance of the duty. But as to true torts, breaches of a legal duty owed to the child, the English law certainly affords no precedent for denying liability.

The great weight of recent American authority is, however, against the right to sue, and for the reasons outlined above. In view of this, we have not in the present case gone further in opposition thereto than was necessary to dispose of the litigation in hand. That is, conceding for the purposes of the argument that there may be some merit in the position taken, it appears to us that it has limits which even the believers therein should recognize, and that these limitations place the present plaintiff outside the class incapacitated to sue. We take up the consideration of the subject from this view-point.

III. It is said that the law establishing individual rights as between those constituting the family group has been of slow development. This is true, but it does not follow therefrom that such rights were not capable of vindication, had they been asserted. Thus, when cases in hand were presented the English courts held that a child's property rights would be upheld, as against his father. *Roberts* v. *Roberts*, Hardres, 96; *Duke of Beaufort* v. *Berty*, 1 P. Wms. 705; *Morgan* v. *Morgan*, 1 Atk. 489. It is observed by way of disparagement that these were chiefly equity cases. But one is not usually mollified by the fact that he is proceeded against in chancery, rather than on the law side of the docket. If the point is that the justices of those courts were administering a doctrine peculiar to equity, the answer is that the cases have always been approved whenever occasion has arisen. *Thomas* v. *Thomas*, 2 K. & J. 79; *Wall* v. *Stanwick*, 34 Ch. Div. 763; *Lamb* v. *Lamb*, 146 N. Y. 317. A minor child could have a writ of waste against his father, who was a tenant by the curtesy. Viner's Abr., Tit. Enfant, H. 6, (12). The decisions cover a period of over six hundred years. The earliest is found in the Year Book of the second year of Edward II. 43 Harv. Law Rev., 1058, *note* 130.

Those cases which were litigated in the chancery courts appear to have been so instituted because the relief sought was equitable, and not because the plaintiff was personally incapacitated to sue elsewhere. In all the hereinafter cited cases denying tort liability, in which this topic is mentioned, the right to sue touching property is conceded. It has been accorded full recognition in this state. *Crowley* v. *Crowley*, 72 N. H. 241.

Upon the issue of the child's personal rights the English decisions are simply silent. It is pure assumption to state that, had a suit for an aggravated assault upon a daughter been presented before the English courts in the eighteenth century, a recovery would not have been allowed, as it was allowed as to property rights. Neither decision nor dictum nor text writer spoke on the subject. The issue is, and must remain, an insoluble mystery. All that can be gathered from the early English law and its history is that there are parental rights and duties which may be superior to independent personal rights of the child. The application of this theory, save as to property rights, was not then developed. But it does not follow from this that a dead hand was laid against the proper disposition of the questions when they arose, either here or there. The analogies of the law, and the declared nature and limitations of the relation in-

volved are the materials from which the true conclusion must be evolved.

The English text writers of the nineteenth century appear to have been unanimous in the opinion that a child might have a cause of action for an assault committed by the father. In the works of these authors it is assumed or unequivocally declared that a malicious injury done to one standing in that relation is an assault. 2 Addison, Torts, (4th *ed.*) 727; Clerk & Lindsall, Torts, (8th *ed.*) 199; Pollock, Torts, (12th *ed.*) 128. The text of the early editions has not been altered. It is suggested that none of them state that the child can sue the father, and the inference is sought to be drawn that the statements refer to criminal liability only. But when it is recalled that each author was writing about civil liability only, it is manifest that the view expressed relates to that subject. As to another English author, there is no possible doubt as to the meaning. "If the father is guilty of positive negligence, if such a term is admissible— of doing something without care or precaution through which the child suffers injury—the child has *prima facie* an action against him." Bev., Neg. (4th *ed.*) 232.

And this situation is not a little suggestive of the answer to the often made assertion that lack of English cases proves a lack of right under English law. The glimpse those authors give us of the state of the English mind, points directly to the conclusion that the view there held was that the capacity of the child to sue the parent for tort was so clear that it would be superfluous to do more than declare it. The actionable nature of the wrong is stated by Addison and by Clerk & Lindsall without comment; and what Pollock says upon the subject leads to the inevitable conclusion that the child has a power to sue. He calls attention to the rule prohibiting suits between husband and wife, because of the theory of legal unity, and warns that it is not to be applied here. Pollock, Torts, 128, *note h.*

These were the English authorities upon the law of torts. Eversley, writing upon the subject of domestic relations, declared that no rule of common law forbade the suit. He also quotes the opposite view of Schouler with the dubious commendation that "the remarks of an American writer (Sch., Dom. Rel. *s.* 275) on this point may be interesting." Eversley, Dom. Rel. (4th *ed.*), 571, 572. In the minds of all these authors, the only doubtful question was whether a duty had been violated. The right to redress for a wrong seems to have been treated as beyond debate.

In this country, there developed a flat disagreement among the

writers upon the subject. More than a century ago the earliest of the text book writers, Judge Tapping Reeve, of Connecticut, took strong ground in favor of the child's right to recover for malicious injuries. Reeve, Dom. Rel. 287. Two generations later, Schouler espoused the opposite view, for the reason that public policy demanded that the family peace and discipline be maintained, even at this cost. Sch., Dom. Rel. s. 275. He would bar suits for wages promised, as well as those for torts. As to the former at least, his position is contrary to the law in this state. *Hall* v. *Hall*, 44 N. H. 293. Cooley could find no reason why the action should not be maintained, but thought the policy of forbidding the child to contest the parents' authority would lead to a failure to sanction suits for excessive punishment. Cool., Torts, 197. And this is all that there was in the way of authority when the first case wherein the issue was directly involved came up for decision in 1891, except some incidental remarks upon the subject in two earlier cases. *Gould* v. *Christianson*, Blatch. & H., 507, 525; *Lander* v. *Seaver*, 32 Vt. 114. "The distinction between a parent and another which these cases make is not one of action and no action, but rather one of substantive difference in the extent of rights and duties." 43 Harv. Law Rev. 1062. So far as they go, they are authorities for rather than against the plaintiff. They at least suggest that there is liability for malicious injuries.

The case which is the first judicial precedent for the non-liability rule is *Hewlett* v. *George*, 68 Miss. 703. The action was for malicious wrong, the charge being false imprisonment. The reported case discloses no research into legal history or theory. The decision is put squarely upon the ground that such actions are prohibited by public policy. What this case "really did was to establish a new rule of exceptional character rather than enforce a rule already established." *Chiuchiolo* v. *Tailors, ante,* 329. In many later cases, the rule has been approved and followed, either in its entirety or with reservations. *Mesite* v. *Kirchenstein*, 109 Conn. 77; *Foley* v. *Foley*, 61 Ill. App. 577; *Smith* v. *Smith*, 81 Ind. App. 566; *Elias* v. *Collins*, 237 Mich. 175; *Taubert* v. *Taubert*, 103 Minn. 247; *Miller* v. *Pelzer*, 159 Minn. 375; *Mannion* v. *Mannion* (N. J.) 129 Atl. Rep. 431; *Damiano* v. *Damiano*, (N. J.) 143 Atl. Rep. 3; *Sorrentino* v. *Sorrentino*, 248 N. Y. 626; *Ciani* v. *Ciani*, 215 N. Y. Supp. 767; *Small* v. *Morrison*, 185 N. C. 577; *Matarese* v. *Matarese*, 47 R. I. 131; *McKelvey* v. *McKelvey*, 111 Tenn. 388; *Roller* v. *Roller*, 37 Wash. 242; *Wick* v. *Wick*, 192 Wis. 260.

This array of authority is not so overwhelming as it might appear. *Mannion* v. *Mannion, Damiano* v. *Damiano* and *Ciani* v. *Ciani* are *nisi prius* decisions of single judges. In *Foley* v. *Foley* and *Taubert* v. *Taubert* the prevailing rule is briefly stated without any consideration of the grounds upon which it is supposed to rest, and in the latter recovery was allowed upon the theory of emancipation. The case of *Sorrentino* v. *Sorrentino* was considered by the appellate division of the supreme court and the court of appeals, but in neither of these courts was any opinion filed. In the court of appeals, however, it appears that the decision was by a vote of four judges to three, and Chief Judge *Cardozo*, together with Judges *Crane* and *Andrews*, dissented. There were also dissenting opinions in *Small* v. *Morrison* and *Wick* v. *Wick*. Distinguishing the point decided from topics discussed, a majority of these suits were for negligence. In one of them (*Matarese* v. *Matarese*, 47 R. I. 131) it is suggested that there may be liability for malicious acts, whereby the substance of the family relation had been destroyed. Several of the decisions (*McKelvey* v. *McKelvey*, 111 Tenn. 388; *Wick* v. *Wick*, 192 Wis. 260; *Ciani* v. *Ciani*, 127 Misc. (N. Y.) 304; *Sorrentino* v. *Sorrentino*, 248 N. Y. 626) are by courts which deprecate the view which prevails here (*Gilman* v. *Gilman*, 78 N. H. 4) that the married women's acts either do or should give the wife a right to sue the husband in tort, unless by express language to that effect.

There is some judicial authority for the view that there should be a recovery. *Clasen* v. *Pruhs*, 69 Neb. 278; *Treschman* v. *Treschman*, 28 Ind. App. 206; *Dix* v. *Martin*, 171 Mo. App. 266; *Steber* v. *Norris*, 188 Wis. 366. It is true that these are not parent and child cases, but most of them were disposed of upon the theory that one *in loco parentis* has the full parental immunity, which does not extend to wilful injury.

To these should be added *Fidelity &c. Co.* v. *Marchand*, (1924) 4 D. L. R. 157, a recent Canadian decision adopting the theory of accountability under a statute declaring that there is liability for damage caused by fault, and denying the existence of any public policy forbidding such suits.

A more detailed review of these cases is rendered unnecessary by the very full consideration given to them by Professor McCurdy in 43 Harv. Law Rev. 1062, *et seq.*

It may also be noted in this connection that a minor's suit for a malicious assault by her parents was litigated in this court, and a judgment for the plaintiff sustained, without any mention being made

of incapacity to sue. *Zebnik* v. *Rozmus*, 81 N. H. 45; 356 Briefs & Cases, 453. Other similarly suggestive instances have occurred elsewhere.

It is suggested that the doctrine of *Kelley* v. *Davis*, 49 N. H. 187, that by the common law the parental duty to support the child is not an enforceable one, is authority for the broader proposition that in all things the child must rely upon the parental instinct to impel just conduct toward him. The case contains nothing to warrant the inference that it rests upon anything but the English rule as to the nature of this particular obligation. It is concerned solely with the scope of a specified parental duty. It does not discuss any other, nor does it suggest that incapacity to sue is the ground for non-liability. The same thing is true of the later cases where the issue of liability for support has been raised. *McConnell* v. *LaMontagne*, 82 N. H. 423, 424, and cases cited.

The duties to protect, provide for and nurture the child, those obligations rightly denominated as parental, have no doubt always been deemed by the English law to be moral only. There could be no recovery for non-feasance in these respects. But these imperfect obligations, imposed by nature because of the parental relation, are quite distinct from the general obligations which the law imposes upon every one in all his relations to his fellow men, and for the breach of which it gives a remedy. A malicious assault upon a child is not referable to the parental relation, nor is a negligent injury, not involving the failure to discharge a parental duty. The duty to refrain from maliciously inflicting physical harm, and from negligently injuring any one by active intervention, is as broad as the contacts of life. *Wessman* v. *Railroad, post.*

To say that no legal duty is imposed by the family relation is one proposition. It would be a very different one to assert that wherever there is a parental relation no legal duty is imposed. Suits by minors against fathers upon contracts and to redress wrongs to the child's property rights afford conclusive answers to any such doctrine.

In the extensive search which has been made by the courts for grounds of non-liability, some subsidiary reasons have been advanced. These may be briefly summarized as follows: 1. Danger of fraud in the prosecution of stale claims. This is merely an argument against the protection generally given to minors against the statute of limitations. 2. Possibility of succession, through heirship by the parent,—a remote contingency, and equally applicable to suits over

property. 3. Depletion of the "family exchequer," which should be held for the benefit of all. This ignores the parent's power to distribute his favors as he will, and leaves out of the picture the depletion of the child's assets of health and strength through the injury. 4. The before considered claim of analogy to the situation of husband and wife. 43 Harv. Law Rev. 1042.

None of these reasons call for more extended discussion. They are too unsubstantial to be considered as more than mere makeweights, to add something to the persuasiveness of the more substantial reasons that have been relied upon in all of the cases. Those reasons are that parental authority and the family peace should be maintained. Whenever it appears that these latter reasons do not apply, the others need no consideration.

The decisions denying the right all depend upon the proposition that the relation of child to parent limits the child's rights, that would otherwise exist, to demand reparation for unlawful conduct towards him on the part of the parent. On its face, the rule is a harsh one. It denies protection to the weak upon the ground that in this relation the administration of justice has been committed to the strong, and that authority must be maintained. It should not be tolerated at all except for very strong reasons; and it should never be extended beyond the bounds compelled by those reasons. Ordinarily, the burden of legal obligation increases with the delicacy and importance of the duty to be discharged.

It is conceded of course that parental authority should be maintained. To this end, it is also conceded that the parent should not ordinarily be accountable to the child for a failure to perform a parental duty, and that vindication of personal rights should not be conceded to the child if it would impair the discharge of such duties. Thus far the reasons commonly denominated public policy carry the argument. For mistaken judgment as to the extent of chastisement, or for negligent disrepair of the home the father provides, there is usually no liability. These acts all grow out of and pertain to the relation of parent and child. The relation gives rise to the duty alleged to have been violated. *Matarese* v. *Matarese*, 47 R. I. 131.

But there may be acts which clearly are not to be referred to such relation. The father who brutally assaults his son or outrages his daughter, ought not to be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong. The relation is rightly fortified by certain rules. Out-

side that relation, the rules are inapplicable; and any attempt to apply them leads to irrational and unjust results.

The law does not make fetishes of ideas. It limits them to their proper spheres. And so this concept of family life ought not to be used as a cloak for intended wrongs. It is always to be borne in mind that denial of recovery has not been put upon the ground that the parent was not a wrongdoer. His conceded wrong has not even been excused. He has escaped liability because it has been thought that a right of recovery would lead to worse results. The child has been sacrificed for the family good. Argument is not needed to sustain the thesis that such a proposition be limited to cases clearly within the reason for the rule.

The reasons for the existence of the theory of non-liability indicate the utmost limits of its application. For acts of passive negligence incident to the parental relation there is no liability. Perhaps it may also be said that for any negligent acts done while the parental relation continues, and not amounting to active intervention, there is generally like immunity, except upon conditions outlined under V.

But there is such a thing as abandonment of the parental relation. This may be shown to have come about by express agreement, or it may be implied from acts. *Clay* v. *Shirley*, 65 N. H. 644; *Johnson* v. *Silsbee*, 49 N. H. 543. It should be implied in the case of malicious injuries. Such acts are in no way referable to the parental status, and they indicate its abandonment more clearly than words.

It may be said that while the parent's wrong is justly considered an abandonment of his right to immunity as an individual, yet the public interest, in behoof of which the immunity is asserted, still persists and demands the continuance of the immunity. The practical answer is that the situation has become such that the chances all are that the ideal sought to be maintained has been destroyed. That ideal was not set up for the particular benefit of the parent. It was established primarily for the good of the child, first as concerns his individual welfare, and secondly, in the larger aspect of making him a desirable citizen. Neither of these ends would be promoted by continuing the ideal as a fiction after its existence in fact was so conclusively disproved. *Matarese* v. *Matarese*, 47 R. I. 131. He who "made a desert and called it peace" has not been deemed a logical reasoner.

To assert that children will become unruly if they have a right to legal redress for malicious assaults upon them, seems a far fetched deduction. It smacks of the abandoned notion that ignorance and

blind obedience of the servient class is necessary to their proper control. The danger that insubordination will arise from possible knowledge of a right to complain of wilful wrong has been magnified out of all proportion to the facts of life. Today, we are not generally afraid of the idea that everybody is governed by law in all his relations. In this age it can hardly be necessary or even desirable that the child be reared in the atmosphere of one under the control of an absolute tyrant. Yet the cases relied upon by the defendant seem to put the parent in the position of a king, who can do no wrong. The true theory appears to us to be that in the discharge of parental duty his position is rather comparable to that of a judge, not accountable for errors, but responsible when he oversteps his jurisdiction. *Sweeney* v. *Young*, 82 N. H. 159; Reeve, Dom. Rel. 289.

The idea that parental authority is absolute because anything less would tend to domestic infelicity or failure of discipline has never been recognized in the English law. Not only have suits over property rights been permitted, but action by the state to punish the guilty parent, or to remove the child from his custody, is everywhere recognized as proper. Curiously enough, these latter proceedings have been urged as reasons why the child should have no direct action for recompense. To the claim that they give him sufficient remedy, it may be shortly answered that it would not be so considered as to any other wrong, or a wrong to any other individual, or a wrong to this one done by any other party. And the theory that they are solely proceedings to punish a public wrong is disproved by the evident fact that a change of custody is made on behalf of the child.

As before stated, there is no general rule denying the child's right to sue his parent. The question whether there are sufficient grounds for denying the right in a given instance, is to be determined by a consideration of the effect of permitting the suit. The issue is a practical one. It is not to be disposed of by the application of a rule of thumb.

Broadly speaking, neither the importance of the ideas sought to be made efficient by the prohibition, nor the danger of their impairment if suits for malicious injuries are allowed, is great enough to outweigh the wrong done by denying recompense for such injuries. Justice calls for the allowance of the suit, and the line separating it from actions for lesser wrongs is a matter of plain logic. To place denial of the right upon the grounds that if this kind of suit were permitted "there is no practical line of demarkation that can be drawn," and that courts must "rely upon certain uniform principles

of law" (*Roller* v. *Roller*, 37 Wash. 242, 244), is to attribute to the law and to legal procedure an impotence which is not usually assumed. *Chiuchiolo* v. *Tailors, ante,* 329.

Much of the foregoing has but an indirect application to the present case. The question has been considered in answer to the argument that, since a child could not recover for a malicious injury, much less could he recover here.

IV. The present suit is not for an intentional wrong, but for a negligent one, growing out of the relation of master and servant. As to this employment, the father had intentionally surrendered his parental control. The plaintiff worked for the usual wage of an employee, and was in fact as well as in name the hired servant of the defendant. The agreement for this relation was for a substantial period.

There is evidence that the father understood that he had done whatever was necessary to make him accountable to the son for failure to perform a master's duty. His taking out insurance against such liability is competent evidence of that fact. It is true there is no estoppel, but the issue here is whether there was evidence to go to the jury. It could be found that there was not only a contract of employment, but that the father also consciously intended to assume the full liability of a master. As far as the father's rights are concerned, it could be found that the relation of the parties had been so modified that the son could maintain this suit. Is there any principle of public policy which forbids modification of the relation in this way?

The law imposes a certain bondage upon minor children; but it also permits release therefrom by act of the parent. The typical case is the release of the right to service or wages earned. As to this, the law here is well settled. The release is not a mere gift which may be revoked at any time. *Crowley* v. *Crowley,* 72 N. H. 241. It places the child in a position where he can make a binding contract, even with the father, and enforce the same in an action at law. *Hall* v. *Hall,* 44 N. H. 293. The idea that this release is merely a protection to third persons who deal with the child was there urged upon the court. But it was held otherwise, and a recovery was allowed, although the contract was for service in the father's family.

The release may be valid although it be partial only. It is not made invalid by the fact that the child remains at home and continues to be supported by his father. "A partial relinquishment of the parental right avails *pro tanto.* . . . the fact that the daughter re-

mained a member of her father's family is material only as evidence to be weighed in determining whether the alleged relinquishment by the father was an act done in good faith." *Johnson* v. *Silsbee*, 49 N. H. 543, 546.

The limitation of this emancipating power is pointed out in *Hall* v. *Hall, supra.* It does not extend to releasing the father from the responsibilities which the law imposes upon him. The rights of the child are protected and may not be impaired. But his disabilities may be removed by the act of the father. This is the distinction between what can and what cannot be done.

There seems to be no distinction in principle between permitting the father to create a situation where the son may sue him for wages, and allowing the son to complain of a violation of the master's duty which was created by the valid contract for service. As was said in *Hall* v. *Hall, supra*, the son labors "as a hired servant." *p.* 296. Every consideration of policy which is urged against this action is equally applicable to the suit for wages. The maintenance of parental authority and the preservation of the family peace are as much imperiled by one as by the other.

The appeal of the defendant is to public policy. That is the only ground for denying the right asserted by the plaintiff. In order for a right commonly enjoyed by individuals generally to be denied to a particular class upon this ground, a pretty clear case ought to be demanded. *Chiuchiolo* v. *Tailors, ante,* 329. As before stated, the family peace idea has never been held to prevent certain suits by the child against the parent, and has been repudiated here as to suits between husband and wife. And when it is considered that, as human affairs go, contracts between parent and child will not be entered into until the child has attained a considerable maturity, the argument as to impaired discipline appears more fanciful than real.

The reasonable thought that parental control diminishes as the child reaches adolescence, is well recognized in law. Thus in *habeas corpus* to regain custody, account is to be taken of the child's wishes if it has "come to years of discretion." *State* v. *Libbey*, 44 N. H. 321. In such a proceeding, "The wishes of the child, who is about thirteen years old, would seem to be entitled to considerable weight. Church, Hab. Corp., *s.* 447." *Hanrahan* v. *Sears*, 72 N. H. 71, 73. The same idea finds expression in the statute giving a minor over fourteen a voice in the selection of its guardian, P. L., *c.* 290, *s.* 14.

But it is said that so long as the parental relation continues the right to sue the parent must be denied to the child,—that in order

for such right to arise the family relation must have ceased to exist. That is, of two minor sons laboring for their father for wages and both injured in a common accident, the one who had left home with his father's consent may recover, while he who continued to live in his father's family cannot.

The distinguishing factor between the cases is the more extended releasing act of the father in one than in the other. The fact that the wholly emancipated son lived outside the family is not controling. The result would have been the same if he had boarded at home. The contract upheld in *Hall* v. *Hall*, 44 N. H. 293, called upon the child to live and labor in the home. It was her status, and not the place where she lived, which was considered to be important. *Johnson* v. *Silsbee*, 49 N. H. 543.

The releasing act of the parent should have the scope intended. If, to fulfil that intent and at the same time satisfy legal limitations, a release from those limitations must exist, the intent to grant such a release is found in the general intent to confer an enforceable right. The defendant intended his act to place the plaintiff in a position to claim a servant's right to sue for negligence. If that envisaged a release of parental control, the control was released. The act of taking the value of the plaintiff's board into account in fixing his wages, tends to the same conclusion. The intent to make the son "his own man" for the time being was sufficiently expressed.

While it is true that emancipating acts are not to be presumed (*Cox* v. *Pinkham*, 80 N. H. 134), it is equally true that they may be inferred. "The father did not 'put his consent into words'; but his acts . . . relative to his daughter's employment at various times . . . justify the inference that he so consented on this occasion, and thus expressed his consent as effectually 'as words would have done'." *Johnson* v. *Silsbee*, 49 N. H. 543, 544.

There is here much more than a mere payment of a gratuity to a child for service legally due the parent. They dealt as strangers would, taking the fact of the plaintiff's board at home into account in fixing his wages. And at once the father treated the situation as one where he owed the son an enforceable duty of due care. He paid insurance premiums for indemnity against a master's liability to the son. All this is not to be disposed of upon the ground that it was "not so uncommon an occurrence as to authorize an inference of any change in the parental and filial ties" (*Searsmont* v. *Thorndike*, 77 Me. 504). In this respect the case is on all fours with *Taubert* v. *Taubert*, 103 Minn. 247. The facts there reported are almost

identical with the offer of proof in this case, and the conclusion was that an emancipation could be found. The plaintiff was entitled to go to the jury upon that issue.

V. As often stated before, the sole debatable excuse advanced for the denial of the child's right to sue is the effect a suit would have upon discipline and family life. If, therefore, the situation is such that the suit will not affect those matters at all, the reason for the theory fails and it should not be applied. There is such a situation here.

When the father undertook the master's responsibility for negligence, he at once paid the price for any violation of that duty. So far as he was practically concerned, it was a completed transaction in which he had no financial stake. The son could not intimidate him by threat of suit, nor would family discord result from a prosecution of the son's claim. Neither was the father obligated to the insurer "to resent or discourage the bringing of a suit for just cause against him." *Maryland &c. Company* v. *Lamarre*, 83 N. H. 206, 208.

It will be said that the father's act in taking out insurance against personal liability cannot create the liability where none existed before. The act which creates the liability, or more correctly, removes a barrier to the enforcement of a right, is the parent's removal of the element which theretofore impaired the right. Had he, instead of insuring, established a trust fund of $10,000 to be applied solely to the liquidation of his liability to his son, the situation would have been in substance what it is here. The only infirmity in the liability is removed in each instance. In both cases the parties' interest and the family interest become for and not against a recovery. It is the fact that the interest lies where it does, and not the means by which the change of interest was brought about, that is of importance. Whenever and however the change is wrought, it removes the only objection to the suit. In each case the child's right becomes an enforceable one concurrently with the action taken by the father. In each he acknowledges his responsibility, and makes ample provision for its discharge without further recourse to him. If the insuring policy is in the usual form, it not only relieves the father from liability to pay the judgment, but also takes from him both the duty and the right to interfere with the defence of the action in any way. *Sanders* v. *Insurance Co.*, 72 N. H. 485.

Emancipation is an answer to this defence, because the father's act has so changed the situation that it is everywhere conceded that there is no longer valid reason for denying a recovery. When the

right of discipline and family association have been surrendered, a rule intended to preserve their integrity is not applicable. The result should be the same when the father assumes the liability, and voluntarily makes a provision for bearing its burden which will entail no further payment by him. In fact, if not in law (see *Toner* v. *Long*, 79 N. H. 458), the insurer became the party liable. More and more such insurance is being looked upon as for the protection of the sufferer, rather than as reimbursement to the wrongdoer. *Sanders* v. *Insurance Co.*, 72 N. H. 485; *Lombard* v. *Company*, 78 N. H. 110. True it is that the judgment would be entered against the father, and that in the event of bankruptcy of the insurer the father would have to pay. But the fact of rendition of judgment is inconsequential, if it entails no real responsibility; and the chance of insolvency of the insurer is too remote to have any bearing upon the probable feelings of the parties to the suit.

The suggestion that the damages recovered might exceed the amount of the indemnity, may be answered in like manner. Such a situation may arise, but it would be a rare exception to the general rule. And even when it did arise, the fact that the payment by the father would be of a part only, and that concurrently therewith a substantial sum (not otherwise recoverable) would come to the son from a third party would naturally reduce the disturbing effect of the unusual situation.

The defendant appeals to a rule of public policy, which is based upon certain inferences of fact. To make this available, it must appear that the facts of the case warrant drawing the inferences. Mere legal technicalities, or remote possibilities of fact, are not sufficient. Public policy is not, or at least ought not to be, enforced on any such basis. *Chiuchiolo* v. *Tailors, ante,* 329.

In the popular thought of the day, the insured party is not liable. In the language of the street, he is "protected" or "covered." In the practical working out of the situation, he is not called upon to pay. In the experience of courts, he is not found to take the situation very seriously. In short, it is contrary to the facts to assert that such a suit would be a disturbing factor in his family life. It is more likely to be viewed as something to be welcomed, as adding to the family assets. More than one writer upon the subject has uttered a warning that the right to recover under such circumstances is open to objection, not because it will induce family discord, but because it will afford opportunity for family conspiracy against the insurer.

The mere fact that the suit is by son against father is not enough to defeat it. It must also appear that the suit is open to the objection which is the only basis for denying a recovery. It appearing that the circumstances alleged to constitute a basis for the objection have been removed by the act of the father, the defence is not open to him. The ground for this is not estoppel, but the non-existence of the essential facts.

In the Connecticut case denying the liability of the father (*Mesite* v. *Kirchenstein*, 109 Conn. 77), it is suggested that if the terms of the policy were such that the child could proceed directly against the insurer there could be a recovery for injury caused by the father's negligence. In this jurisdiction, where the rights of parties are determined on their substance, without regard to form, there would be a recovery in this case upon the Connecticut view of the substantive law.

It is said that since the insurer is liable only when the father is, it cannot be concluded that the father is liable because the insurer is. In a narrow sense this is true. But the essential fact which establishes the suability of the father is that he has provided for satisfying the judgment in some way which removes the suit from the class promotive of family discord. There can be no valid objection to his doing this. And almost of necessity the act which removes the objection to the suit by relieving him from ultimate responsibility will at the same time place that responsibility upon another, whose distress under suit will not affect the defendant's family relations.

The father is made liable to suit by the proceedings taken by him. The suit is maintainable because the enforcement of his liability has been made innocuous. Making it innocuous is the precise object of taking the insurance. The consequences of making it thus harmless to the defendant are assumed by the insurer.

It may be urged that this argument, if carried to its legitimate conclusion, might make the father liable for the negligent discharge of any duty imposed upon him as a parent, whenever he has general liability insurance. But it is to be remembered that by the common law of this state parental duties are not legal duties. Mere neglect to support, passive negligence, is not a common-law wrong in this jurisdiction. As to such breaches of mere moral duty, the law affords no direct remedy to the injured party. This is not because of a disability to sue, but for lack of a wrong recognized by the common law. Of course it is clear that insurance which is against legal liability only does not cover the case.

■■■■■

As to negligent acts by way of active intervention, there is a different situation. Here the denial of recovery to a minor child must be based upon incapacity to sue. The wrong exists, and if it is insured against, the asserted obstacle to a suit is removed, as hereinbefore indicated. But upon the issue, whether it was insured against, a distinction may be made between cases where there is no evidence that such a result was intended, and those where it affirmatively appears that the insuring contract was made with the specific liability in mind. This goes upon the ground that in the case of general insurance it may well have been the legal understanding of the parties to the insurance contract (if recognition of general liability for active intervention be refused) that no such liability was covered. The then necessary intent to insure the specific risk is lacking. But when, as in this instance, a liability to the child is specified as the one insured against, there is no room for such an argument.

Again, it is asked: can the fact of insurance take a defence away from the insured? It can when that defence is the imminent danger of financial loss (in fact and not merely in legal theory), through a judgment in the suit. Much more, when the danger of loss is not the defence, but only a circumstance upon which another defence is rested, may the fact of indemnity be used as an answer. The defence being based upon the proposition that there will be family trouble because of the adversary state of mind between parent and child, created by the prospective gain to the child at the expense of the parent, anything which shows that, to the knowledge of the parties, there is no substantial prospect of such loss, destroys the foundation for the defence. It cannot be concluded that a result will follow from a non-existent cause. Just as the defence may be taken away by the father's act emancipating the child, so a like result should follow from any other act of his which removes from the situation the factor which has been relied upon to defeat a recovery.

Again paralleling cases, it may be asked why should the son of the insured father recover while the son of the uninsured cannot? A partial answer is that the latter should be allowed to recover under the theory advanced under IV whenever the evidence warrants a finding that the father intended to emancipate the son so far as necessary to create a legal responsibility for negligence. In cases where there is neither such an emancipation, nor a provision which abolishes all tendency for the suit to induce family discord, the reasoning of the cases relied upon by the defendant is applicable, if not always convincing.

Most legal distinctions are matters of degree. The line must be drawn somewhere. But in this instance there is a real difference in kind,—not indeed in the nature or extent of the wrong done, but in the existence of an excuse for non-liability. The excuse being based upon the policy of the law to preserve family accord and parental authority, anything which demonstrates that the suit will not interfere with those matters proves a difference in kind. The distinction is as plain as that between the cases of the emancipated and the unemancipated.

If there is in the whole situation thus dealt with any element of injustice, it is in those instances where suit is denied, and not in those where it is permitted. And in none of them, so dealt with, is there anything to offend against the canon that family discipline and peace must be maintained.

VI. It is suggested in argument, and in some of the cases wherein liability has been denied, that these suits would never have been brought if there had been no insurance. This is undoubtedly true, but the real significance of the statement has been disregarded. The fact that suits are brought under these circumstances only has, in and of itself, no bearing upon the issue whether a wrong has been committed. But it is of large significance as an answer to the claim that filial loyalty is not a sufficient protection from ungrateful action against worthy parents. Experience in the matter is perhaps still too limited to furnish reliable proof; yet the fact that there appear to have been no suits, save for malicious injuries, before insurance was known and used, coupled with the recent institution of actions for negligence where there is insurance, points with reasonable certainty to the answer to the prophecies of untoward results to follow any holding that the parent is accountable to the child. It shows that suits which would harrass the parent, impair his authority and disrupt the home are not likely to be brought.

The situation as disclosed by what has happened up to this time reassures one in the belief that filial regard rests in a pervasive natural instinct. It is superior to mere man made rules of law. It cannot be created by them. Affection and reverence do not come by that road. If they are not present, the peace of the house where they are lacking and the authority of the parent toward whom they are not entertained are in fact neither sacred nor beautiful. In such a situation, where the parties' appeal is to law rather than affection, no good end would be served by attempting to limit the application of the usual rules of law governing the conduct of individuals.

The communal family life is held together and its continuity assured by something finer than legal command. In the vast majority of cases, the corresponding filial and parental instincts are all sufficient. Statutes imposing a duty to support are not for them. Such laws are for the rare exceptions; and no one suggests that they ought to be repealed because knowledge of their existence will make children unruly. The fear that the family structure will be undermined if the minor, while a member of the family, shall gain the right to sue, is not justified by such experience as we have. This appears to be the English view of the general question. "In this country, however, the law has not deemed it necessary to make much provision on the subject of the filial obligations." 2 Stephens, Com. on the Laws of Eng., 448.

For these reasons one may well question the soundness of the line of recent American cases denying a general accountability of the parent for either malicious wrongs or those caused by active intervention. But, as stated early in this opinion, upon the offers of proof in this case it is not necessary to go that far.

VII. The suggestion is made that Laws 1911, c. 104, (P. L., c. 290, s. 4) making the parents joint guardians of their minor children, limits the father's power. The question is not raised by the case. There was no evidence about the plaintiff's mother. For aught that appears she may not have been living, or may have consented to the arrangement made. The motion for a nonsuit was made and granted because "a minor child cannot sue his parent for tort," and that is the only question presented for decision here.

VIII. To sum up our conclusions: Such immunity as the parent may have from suit by the minor child for personal tort, arises from a disability to sue, and not from lack of violated duty. This disability is not absolute. It is imposed for the protection of family control and harmony, and exists only where a suit or the prospect of a suit, might disturb the family relations. Stated from the viewpoint of the parent, it is a privilege, but only a qualified one. It is not an answer to a suit for an intentional injury, maliciously inflicted. It does not apply to an emancipated child, or to a case where liability in fact has been transferred to a third party.

Whether the rule of liability should be broader than this, and include all cases of active intervention, is a question upon which no conclusion is intended to be stated.

The employment of the son was entered upon and continued under circumstances from which it could be found that the father intended

to take on a full master's responsibility, and to release his parental control so far as necessary to attain that end. And it must be found that this suit has no tendency to disturb the family relations. Proof of either situation would remove the only substantial objection to the maintenance of the action.

*Plaintiff's exception sustained: defendant's exception overruled.*

ALLEN, J. dissented: MARBLE, J. concurred in the result: the others concurred.