698 A.2d 1097

**James K. EAGAN, Guardian of the Property and Next Friend of Laura M. Calhoun and Kevin J. Calhoun, minors**

v.

**John C. CALHOUN.**

**No. 109, Sept. Term, 1996.**

Court of Appeals of Maryland.

Aug. 26, 1997.

74

Gary S. Peklo, Ellicott City, for Petitioner.

Emile J. Henault, Jr., Glen Burnie, for Respondent.

Kieron F. Quinn, Baltimore, for amicus curiae, Maryland Trial Lawyer's Association.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

This case constitutes another assault on the doctrine of parent-child immunity, adopted into the Maryland law in *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930) and, with but limited exceptions, retained consistently since then. *See,* most recently, *Renko v. McLean,* 346 Md. 464, 697 A.2d 468 (1997). Here, however, the claimant shall have a measure of success. We shall hold that the doctrine does not bar a wrongful death action filed on behalf of an unemancipated minor child against the child's parent when the action is based on the murder or voluntary manslaughter by that parent of the child's other parent.

## I. BACKGROUND

### A. *The Immunity Doctrine And Its Exceptions*

We have traced the nature and history of the parent-child immunity doctrine on several occasions recently and need not do so again, in any significant detail, in this case. *See Frye v. Frye,* 305 Md. 542, 505 A.2d 826 (1986); *Warren v. Warren,* 336 Md. 618, 650 A.2d 252 (1994), and *Renko v. McLean, supra.* The doctrine was judicially created as a precept of common law. In *Frye v. Frye, supra,* we stated its basis as being the protection of family integrity and harmony and of parental discretion in the discipline and care of the child, and we posited that the doctrine "enhances the public policy in that it subserves the repose of families and the best interests of society by preserving the peace and harmony of society and of the families composing society." *Frye,* 305 Md. at 552, 505 A.2d at 831. In *Warren v. Warren, supra,* 336 Md. at 625, 650 A.2d at 255, we noted three other policy justifications for the doctrine: preservation of parental discipline and control, prevention of fraud and collusion, and the threat that litigation between parents and children would deplete family resources.

As we further observed in *Warren:*

"In the years since *Schneider,* we have deviated from the basic doctrine in only three instances. First, a minor child who has suffered harm from cruel, inhuman, or outrageous conduct at the hands of a parent may bring suit for monetary damages. *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923 (1951). Second, an emancipated child may sue his parent in tort for claims arising after the child reaches the age of majority. *Waltzinger v. Birsner,* 212 Md. 107, 128 A.2d 617 (1957). Finally, a child may sue the business partner of his parent for negligence committed in the operation of the parent's partnership. *Hatzinicolas v. Protopapas,* 314 Md. 340, 550 A.2d 947 (1988)."

*Id.*

That is the current state of the Maryland law. Subject to those three exceptions, the doctrine of parent-child immunity continues to exist in this State. *Renko v. McLean, supra.*

The exception at issue here is the one recognized in *Mahnke v. Moore.*

*Mahnke v. Moore* was an unusual case. A minor child, by her grandfather, filed suit against her father's estate for "personal injuries caused by atrocious acts committed by her father in her presence." 197 Md. at 63, 77 A.2d at 923. The child alleged that, in her presence, her father shot her mother in the head with a shotgun, that he kept the child in the home with the dead body for six days, and that he then drove the child to his home in New Jersey where, in her presence, he shot and killed himself with a shotgun, causing his blood to spatter on her face and clothing. Those acts, she averred, caused her to suffer shock, mental anguish, and nervous and physical injuries. Relying on the doctrine of parent-child immunity, the trial court dismissed the complaint.

We reversed. We noted that, at common law, there was no legal impediment to tort actions by children against their parents and that the immunity doctrine originated with an 1891 Mississippi case, *Hewlett v. George,* 68 Miss. 703, 9 So. 885 (1891), holding that a minor child could not maintain an action in tort against his parent for wrongful confinement in an insane asylum. The Mississippi court cited no authority for that proposition and drew no distinction in its broad grant of immunity between acts of negligence due to an error in judgment and wilful, wanton, and malicious acts. We observed that, despite its shaky foundation, the broad doctrine was accepted by a number of other States, including Maryland, although New Hampshire, in *Dunlap v. Dunlap,* 84 N.H. 352, 150 A. 905, 910 (1930) put a limit on it, declaring that "[t]he father who brutally assaults his son or outrages his daughter ought not to be heard to plead his parenthood and the peace of the home as answers to an action seeking compensation for the wrong." That case, we noted, was cited by this Court in *Schneider v. Schneider, supra,* 160 Md. at 22, 152 A. at 499.

In *Mahnke,* we essentially adopted the view of the New Hampshire court that, although the doctrine was useful within

the bounds of a normal parent-child relationship, it had no rational justification where that foundation did not exist. We acknowledged that parental authority needed to be maintained and that a child should forgo a recovery of damages "if such recovery would unduly impair discipline and destroy the harmony of the family." 197 Md. at 68, 77 A.2d at 926. Thus, we confirmed that "[o]rdinarily, the parent is not liable for damages to the child for a failure to perform a parental duty, or for excessive punishment of the child not maliciously inflicted, or for negligent disrepair of the home provided by the father." *Id.* Those acts, we said, "grow out of and pertain to the relation of parent and child." *Id.* But, we added:

"[W]hen, as in this case, the parent is guilty of acts which show complete abandonment of the parental relation, the rule giving him immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit. Justice demands that a minor child shall have a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs."

*Id.*

In that particular case, we held that "there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquillity are to be preserved." *Id.*

The question before us is whether the peg represented by this case can fit into that hole.

### B. *Factual And Procedural History*

On May 13, 1992, John Calhoun kicked a ladder on which his wife, Gladys, was standing as she cleaned a gutter on the roof of their home, causing her to fall to her death. There was more than ample evidence establishing that John's conduct was wilful and deliberate. After observing Gladys fall to

the ground, in an obviously helpless condition, John, who had CPR training, did nothing to help her, either directly or by calling for assistance. Instead, he let her lie there, unattended, for about ten hours. He went about other business, picked up his two children, Laura and Kevin, from school, took them to a softball game and out to dinner, denied that he knew where their mother was, and kept them away from the back of the house where he knew her body was lying. It was not until late that night that his nephew who had come to the home to help search for Gladys, discovered the body. John disclaimed any knowledge of how she came to be lying there. There was evidence that Gladys did not die instantly from the fall but survived for some period of time; there was also some evidence, sharply contested by John, that her fatal injury may have come from blows inflicted with a blunt instrument rather than from the fall itself.

In three interviews with the police, John maintained that he was not at home when Gladys fell and was unaware that she had fallen. On June 6, 1992, however, after the police confronted John with their knowledge that he was having an affair with another woman and that he wanted a divorce from Gladys but was concerned about the financial implications of a divorce, John confessed to having caused his wife's death, stating that, after a sharp exchange with her, he "got mad and kicked the right foot of the ladder and the ladder twisted slightly." Following an autopsy, the medical examiner opined that Gladys died of head injuries sustained in a fall from the ladder and that the manner of death was homicide.

On the basis of this and other evidence, John was charged with second degree murder, voluntary manslaughter, and reckless endangerment. On March 11, 1993, he entered into a plea agreement under which he pled guilty to voluntary manslaughter, and, on June 24, 1993, he was sentenced to prison for five years. In anticipation of his incarceration, John placed Laura and Kevin in the temporary care of family friends, and, on April 13, 1993, he approved a consent order by the Circuit Court for Howard County awarding temporary custody of the children to that couple.

Laura was eleven and Kevin was nine when their mother was killed. In September, 1993, the court appointed James Eagan as guardian of the children's property. On February 10, 1994, Eagan, in his capacity as guardian, filed this action against John, asserting that, "[a]s a direct result of [John's] wrongful acts which caused the death of their Mother, [Laura] and [Kevin] have suffered and will continue to suffer pecuniary loss, mental anguish, emotional pain and suffering, and the loss of the society, companionship, comfort, protection, care, training, guidance and love of their Mother" and seeking, for each child, $10 million in damages.

In an amended answer to the complaint, John averred that the children's claim was barred by the doctrine of parent-child immunity. He contended that the doctrine applied to wrongful death actions and that such an action could not be brought against a father predicated on the death of the children's mother. In an effort to meet that defense and with an eye on this Court's decision in *Mahnke v. Moore*, Eagan filed an amended complaint adding the alternative assertions that John's conduct was (1) intentional, outrageous, intolerable, without legal justification or excuse, influenced by hatred or spite, and performed in order to deliberately injure or cause damage to Gladys, or (2) so reckless, wanton or wilful as to be tantamount to an intentional disregard of Gladys's rights.

John pressed his immunity defense through two motions for summary judgment and through motions for judgment made at the conclusion of the plaintiff's case and at the end of the entire case. Those motions were denied upon a finding that the plaintiff had presented sufficient facts to place the case within the exception to the immunity doctrine set forth in *Mahnke v. Moore*.

The court submitted a three-part verdict sheet for the jury to consider. The first question asked whether, on the claim that John committed a wrongful act that caused Gladys's death, the jury found for Laura and Kevin or for John. If the verdict on that issue was for the children, which it was, the jury was instructed to answer the second question. That

asked whether, with respect to the claim that John's wrongful act was atrocious, showed a complete abandonment of the parental relation, was intentional, wilful, or malicious, the jury found for the children or for John. The jury declined to answer that question, leaving the space blank. The third question, which was to be answered only if the jury found for the children in question one or questions one and two, asked for the jury's assessment of damages. The jury awarded a total of $2,360,000, broken down as follows: (1) economic damages to Laura: $70,000; (2) economic damages to Kevin: $90,000; (3) compensation to Laura for mental anguish, emotional pain, loss of society, companionship, comfort, protection, parental care, attention, advice, counsel, training, and guidance: $1 million; (4) compensation to Kevin for similar loss: $1 million; (5) compensation to Laura for education that she reasonably expected would be paid by Gladys: $100,000; and (6) similar compensation to Kevin: $100,000.

Concerned about the jury's failure to respond to the second question, Eagan asked that it be resubmitted in separate parts. John, who had objected to the question initially, objected to its resubmission. The court agreed with John, ruling that, once the jury found in favor of the children on question one, they could award damages without answering question two.

John appealed the judgments against him to the Court of Special Appeals, which reversed and remanded the case for a new trial. *Calhoun v. Eagan*, 111 Md.App. 362, 681 A.2d 609 (1996). The appellate court considered four issues, all in the context of whether John was entitled to the protection of parent-child immunity. The court first addressed Eagan's claim that the immunity doctrine did not apply to a wrongful death action. His argument was that the children's action derived from the action that Gladys would have had if she had survived and that, as her action would not have been barred, theirs was not. The court rejected that argument, concluding that a wrongful death action under Maryland Code, §§ 3–902 and 3–904 of the Courts and Judicial Proceedings Article was a personal one possessed by the survivors for their own losses.

The impediment emanating from the parent-child immunity doctrine therefore applied to them. The court then discussed the nature of the exception to the immunity doctrine laid out in *Mahnke v. Moore*, focusing on John's argument that he never intended by his conduct to abandon the children or his parental relationship with them. The court found no merit in that argument either, concluding that the issue was not whether John subjectively intended to abandon his parental relationship with Laura and Kevin but whether his conduct was sufficiently egregious to have that effect.

The last two issues overlapped. Against John's argument that the trial court should have granted his motions for summary judgment and for judgment on the evidence, the court held that the evidence was legally sufficient to show that he had deliberately killed Gladys and that it also, therefore, sufficed "to generate an issue as to the applicability of the *Mahnke* exception." 111 Md.App. at 398, 681 A.2d at 626. What led to the reversal was the court's conclusion that, given the contradictory evidence as to whether John's conduct was wanton and malicious, the issue of whether *Mahnke* applied was for the jury to determine and that its failure to answer the second question on the verdict sheet required the declaration of a mistrial. It is on that point that we part company with the Court of Special Appeals.

## II.  DISCUSSION

### A.  *Abrogation Of Doctrine*

Eagan first asks that we abrogate entirely the doctrine of parent-child immunity, as so many other States have done. As indicated, we just declined that invitation in *Renko v. McLean* and shall not renege on that declination here.

### B.  *Application To Wrongful Death Action*

Eagan next presses his argument that the doctrine does not apply because the children's action derives from that of their mother, who would not have been barred from suing her husband had she lived. That, too, we reject. A wrongful

death action, unlike a survivor's action that may be filed by a personal representative, is not derivative in the sense asserted. *See Stewart v. United Electric Light and Power Co.*, 104 Md. 332, 65 A. 49 (1906); *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972), *overruled on other grounds by Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633, *recons. denied*, 325 Md. 665, 602 A.2d 1182 (1992). While certainly based on the death of another person, it is not brought in a derivative or representative capacity to recover for a loss or injury suffered by that person but, rather, is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death. *United States v. Streidel*, 329 Md. 533, 620 A.2d 905 (1993).

It follows from the fact that the action is a personal one to the claimant that the claimant is ordinarily subject to any defense that is applicable to him or her, whether or not it would have been applicable to the decedent. Thus, the fact that Gladys would not have been barred by any doctrine of parent-child immunity from suing John does not relieve Laura and Kevin of that impediment. *See Heyman v. Gordon*, 40 N.J. 52, 190 A.2d 670 (1963) (child's wrongful death action against his father for the death of his mother barred by parent-child immunity), *overruled in part by France v. A.P.A. Transport Co.*, 56 N.J. 500, 267 A.2d 490 (1970) (abrogating parent-child immunity for motor torts); *Durham v. Durham*, 227 Miss. 76, 85 So.2d 807 (1956) (parent-child immunity prohibited a minor's wrongful death action against her father for the death of her mother), *overruled in part by Glaskox v. Glaskox*, 614 So.2d 906 (Miss.1992) (abolishing parent-child immunity for motor torts); *Strong v. Strong*, 70 Nev. 290, 267 P.2d 240, *reh'g denied*, 70 Nev. 290, 269 P.2d 265 (1954) (common law doctrine of parent-child immunity barred an action by a child's guardian ad litem against the child's mother for the wrongful death of the child's father), *overruled in part by Rupert v. Stienne*, 90 Nev. 397, 528 P.2d 1013 (1974) (abrogating parent-child immunity). As Maryland continues

to recognize the parent-child immunity doctrine and as Eagan stands in the stead of Laura and Kevin, he labors under the disability of that doctrine.

## C. *The Mahnke Exception*

Although, as we have indicated, *Mahnke v. Moore* presented some most unusual and egregious conduct, the underpinning of our decision was not limited to those facts. We have identified four bases for the immunity doctrine: the preservation of peace and harmony of the family, the preservation of parental control and discretion, the prevention of collusion and fraud, and averting a depletion of family resources that litigation between parents and children might cause. When the conduct giving rise to the action is of such a nature to have, itself, destroyed the family harmony and significantly eroded any realistic prospect of parental control and discretion, and there is no indication of fraud or collusion or the risk of depleting resources that otherwise would be devoted to the family unit, there is no longer any justification for the immunity and therefore no logical or public policy reason to apply it.

Those circumstances do not necessarily arise merely because culpable conduct causes the death of a family member, and we therefore, expressly, do not extend the *Mahnke v. Moore* exception to every wrongful death case. Tragic deaths often arise from acts of negligence or excessive, but non-wilful, behavior on the part of family members—automobile accidents, carelessness in the home, for example—and, although such tragedies may well put a serious strain on some of the family relationships, they do not generally destroy a parent-child relationship. A parent who negligently causes the death of his or her spouse or of a child can still maintain a parent-child relationship; the family, even in its grief, can survive. Thus, the mere fact that death is the consequence of the conduct is not a reason to discard the doctrine.

When the death is occasioned by murder or voluntary manslaughter, however, any remaining relationships are far more likely to be sufficiently shattered to be beyond further impairment by a lawsuit. The blow is not just the death itself,

or even the hard fact that it was caused by the other parent, but rather that the killing was intentional and not the product of mere carelessness. Added to the psychological trauma of that are the likely collateral consequences of such criminal behavior. The evidence in this case demonstrates the point. When this suit was filed, there was no longer a family unit; Gladys was dead, John was in prison, and Laura and Kevin were in the legal and physical custody of another couple. John had no ability to exercise any parental discretion or control; because he was in prison, guardians had been appointed of the persons and the property of the children. The personal relationships between John and the children had soured to the point that there was little contact between them; John wrote to them from prison, but they did not respond. Certainly, there was no indication of any fraud of collusion between John and his children, and there was no evidence that resources that otherwise would have been devoted to the family unit would be depleted by the lawsuit. Indeed, John testified that his resources had been depleted in defending the criminal charge. In short, the underpinnings of the immunity doctrine no longer existed.

John argues that he has not abandoned the parental relation with his children, noting that he cared for them for a time after Gladys's death, made arrangements for their care during his incarceration, and hopes to be reunited with them after his release. He further asserts that, because he hopes to be reunited with his children, their suit against him "would unduly impair discipline and destroy the harmony of the family." He maintains that the policies underlying parent-child immunity will be preserved by its application in this case.

▮ It may be that, at some time in the future, John and his children will reconcile and reform a family unit. That is not the point, however. Although we cited the relevant facts in this case in support of our more general belief, our view of the matter is that, when a wrongful death action is predicated on a murder or voluntary manslaughter, the immunity should not apply as a matter of law. Application of the doctrine in such a case does not depend on the particular underlying

circumstances, which, in their details, will likely vary from case to case. The murder or voluntary manslaughter of a spouse or child by a parent necessarily constitutes cruel and inhuman treatment, not just of the person killed but of the other family members as well. For purposes of the immunity doctrine, even if not for other purposes, it also constitutes an abandonment of the parental relationship and of the broader family harmony, and, as a matter of judicial and legal policy, it should not bar a wrongful death action by the remaining family members otherwise entitled to bring such an action.

This policy is consistent with the "slayer's rule" that we have adopted in order to preclude persons guilty of murder or voluntary manslaughter from profiting from their conduct by claiming inheritances and insurance proceeds otherwise payable only because of the victim's death. That rule, developed in three cases—*Price v. Hitaffer*, 164 Md. 505, 165 A. 470 (1933), *Chase v. Jenifer*, 219 Md. 564, 150 A.2d 251 (1959), and *Schifanelli v. Wallace*, 271 Md. 177, 315 A.2d 513 (1974)—was summarized in *Ford v. Ford*, 307 Md. 105, 512 A.2d 389 (1986), essentially as follows: (1) a person who kills another may not share in the distribution of the decedent's estate, either as an heir or as a beneficiary under a will, and may not, as a beneficiary, collect the proceeds under an insurance policy on the decedent's life "when the homicide is felonious and intentional," and (2) the person may share in the distribution and may collect life insurance proceeds "when the homicide is unintentional even though it is the result of such gross negligence as would render the killer criminally guilty of involuntary manslaughter." *Id.* at 111–12, 512 A.2d at 392. That is precisely the standard we hold applicable to the defense of parent-child immunity in a wrongful death action. Not only, for the reasons we cited above, does it mesh neatly with the function of the immunity doctrine, but it conforms as well with the broader public policy underlying the slayer's rule—that a person who commits a felonious and intentional killing should not benefit from that conduct.

■ In addition to recounting the substance of the slayer's rule, *Ford v. Ford* laid out the procedure for implementing it.

We noted there that the disposition of a criminal proceeding "is not conclusive of the character of the homicide or of the criminal agency of the putative killer in a civil proceeding concerning entitlement to assets of the decedent." *Id.* at 112, 512 A.2d at 392–93. Rather, the determination of "whether the alleged killer was the criminal agent and whether the homicide was intentional and felonious or unintentional is a function within the ambit of the civil proceeding." *Id.,* 512 A.2d at 393. That view is consistent with the law generally. A criminal conviction is not conclusive of the facts behind it in a subsequent civil proceeding, and, indeed, the conviction is ordinarily not even admissible in the civil action as evidence of the underlying facts. *Briggeman v. Albert,* 322 Md. 133, 137, 586 A.2d 15, 17 (1991); *Aetna Cas. & Sur. Co. v. Kuhl,* 296 Md. 446, 450, 463 A.2d 822, 825 (1983); *Brooks v. Daley,* 242 Md. 185, 196, 218 A.2d 184, 190 (1966).

Under this approach, the critical issue, as to liability, to be resolved in this case was whether John's conduct causing Gladys's death was intentional, so as to constitute at least voluntary manslaughter. There was no dispute that he caused her death; the only issue was his mental state. The question put to the jury, unfortunately, was not merely whether his conduct was intentional, but whether his acts were "atrocious, show a complete abandonment of the parental relation, were intentional, were willful and were malicious." That asked too much of the jury, for, if the killing was intentional, the atrociousness of it and its effect as an abandonment of the parental relation would follow as a matter of law. As we indicated, Eagan asked that the court resubmit the question in its constituent parts, which would have allowed the jury to determine whether the killing was intentional but, over John's objection, the court refused that request.

■ Ordinarily, on disputed evidence, it would be a jury question whether the killing of Gladys was an intentional act on John's part, and, because of John's testimony, we would be required to direct that the case be remanded for a new trial on that issue. Here, however, we are spared that task. First,

there was evidence that John had entered a plea of guilty to manslaughter, which constituted a judicial admission that he killed Gladys and that his act of killing her constituted voluntary manslaughter. *See Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 403, 347 A.2d 842, 847 (1975); *Briggeman v. Albert, supra,* 322 Md. at 135, 586 A.2d at 16. That admission was not conclusive, of course, and was subject to rebuttal. More significantly, however, in support of his motion for summary judgment, John placed into the record, as an exhibit to his affidavit describing his close feelings toward his children and all that he had done for them following Gladys's death, a memorandum of law filed by his attorney in a collateral proceeding dealing with the guardianship of Laura and Kevin. That memorandum addressed specifically the nature of John's interest in the erstwhile marital home, which had been held by him and Gladys as tenants by the entireties, and, in it, he took the position that, because of the "slayer's rule," he held the half interest that devolved to him by reason of Gladys's death in trust for his children. After discussing in some detail the "slayer's rule," including an awareness that, if the killing of Gladys was intentional, he would be unable to take title to her undivided half interest in the property, he conceded that he was, indeed, subject to that rule and that, as a result, he could not share in the distribution of her estate or collect any proceeds of insurance on her life and would hold her former half interest in the marital property as trustee for his children. Through counsel, he concluded the memorandum with the following statement:

"In the case of JOHN C. CALHOUN, the death of GLADYS ESTHER CALHOUN was *homicide,* homicide was *voluntary manslaughter,* Mr. Calhoun was the *criminal agent,* he was not adjudicated *insane* by the court. He was convicted of *voluntary manslaughter* and incarcerated. The elements are prima facie within the ambit of the slayer's rule."

(Emphasis in original.)

Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the English

Court of Exchequer in *Cave v. Mills,* 7 H. & W. 927 that "[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another." *See Edes v. Garey,* 46 Md. 24, 41 (1877); *see also Hall v. McCann,* 51 Md. 345, 351 (1879); *Scanlon v. Walshe,* 81 Md. 118, 132, 31 A. 498 (1895); *Stone v. Stone,* 230 Md. 248, 253, 186 A.2d 590, 593 (1962); *Wilson Brothers v. Cooey,* 251 Md. 350, 359, 247 A.2d 395, 400 (1968); *Van Royen v. Lacey,* 266 Md. 649, 651–52, 296 A.2d 426, 427–28 (1972). In *Stone v. Stone* and *Wilson Brothers v. Cooey, supra,* we adopted the statement of that principle set forth in 19 AM.JUR. *Estoppel* § 50 (1939), now found in 28 AM.JUR.2D *Estoppel and Waiver* § 68, at 694–95 (1966):

> "Generally speaking, a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action."

■ In the memorandum filed by his attorney in connection with the guardianship matter, John acknowledged that his conduct constituted voluntary manslaughter and was therefore intentional. John was obviously aware of that memorandum, as he attached a copy of it to his own affidavit filed in this case. Having thus conceded that the killing of Gladys was an act of voluntary manslaughter, John is estopped from taking any contrary position in this case. At the very least, the force of that estoppel allows the plea of guilty to stand unrebutted and thus to establish that the killing was a voluntary manslaughter. Accordingly, the *Mahnke v. Moore* exception applies as a matter of law, and, as the circuit court concluded, the failure of the jury to answer the second question on the verdict sheet is without consequence. We shall therefore vacate the judgment of the Court of Special Appeals and remand with directions to affirm the judgment of the circuit court.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED WITH INSTRUCTIONS TO

AFFIRM JUDGMENT OF CIRCUIT COURT; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.