*Claudia Grier, et al. v. Timothy Heidenberg*, No. 2523, September Term, 2019
Opinion by Kehoe, J., Concurring Opinion by Arthur, J.

**NEGLIGENCE—PARENT-CHILD IMMUNITY—ABROGATION**

The doctrine of parent-child immunity was first applied in Maryland nearly a century ago in *Schneider v. Schneider*, 160 Md. 18 (1930). On several occasions, the Court of Appeals and the Court of Special Appeals have been asked to abrogate the doctrine in its entirety, most recently in *Bushey v. Northern Assurance Co. of America*, 362 Md. 626, 645 (2001). Both courts have consistently declined to do so. Assuming for purposes of analysis that the principle of *stare decisis* would permit the Court of Special Appeals to do so, societal mores, expectations, and values have not changed sufficiently since 2001 to warrant abrogation of the doctrine of parent-child immunity in its entirety.

**MD. CODE, COURTS & JUD. PROC. §§ 3-901–04—WRONGFUL DEATH ACT— APPLICABILITY OF PARENT-CHILD IMMUNITY IN CLAIMS BASED ON NEGLIGENCE**

In *Smith v. Gross*, 319 Md. 138 (1990), the Court of Appeals held that the parent-child immunity barred recovery in a wrongful death action arising out of a child's death caused by a parent's negligence. This holding was not abrogated by *Mummert v. Alizadeh*, 435 Md. 207 (2013).

Circuit Court for Howard County
Case No.: 13-C-17-113797

_____

CLAUDIA GRIER, ET AL.

v.

TIMOTHY HEIDENBERG

_____

Kehoe,
Arthur,
Reed,

JJ.

_____

Opinion by Kehoe, J.
Concurring Opinion by Arthur, J.
_____

Filed:  September 1, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Justice Holmes observed more than a century ago that "[t]he language of judicial decision is mainly the language of logic."[1] The dispassionate language of this opinion should not obscure our profound sympathy for the parties and all others affected by the tragic death of Michaelangelo Heidenberg.

Michaelangelo died on July 21, 2016. He was the son of Claudia Grier and Timothy Heidenberg. Ms. Grier, in her own name and as the personal representative of Michaelangelo's estate, filed a wrongful death and survival action against Mr. Heidenberg and his mother, Marguerite Heidenberg, in the Circuit Court for Howard County. After a somewhat complicated procedural history that we will presently summarize, the circuit court dismissed Ms. Grier's operative complaint with prejudice insofar as it asserted claims against Mr. Heidenberg. The court also certified its judgment as final for purposes of appellate review pursuant to Md. Rule 2-602(b). Ms. Grier presents two issues that we have reworded slightly:

> 1. Did the trial court err in granting Mr. Heidenberg's motion to dismiss on the basis that the doctrine of parent-child immunity survives the death of the child?
>
> 2. Should Maryland retain the doctrine of parent-child immunity?[2]

---

[1] Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 HARV. L. REV. 457, 465 (1897).

[2] Ms. Grier presents the issues as:

> 1. Did the trial court err in granting appellee's Motion to Dismiss on the finding that the doctrine of parent-child immunity survives the death of the child?
>
> 2. Should Maryland retain the court created doctrine of parent-child immunity?

The contentions in this appeal involve the scope and continuing viability of the doctrine of parent-child immunity, first applied in Maryland nearly a century ago in *Schneider v. Schneider,* 160 Md. 18 (1930), and the doctrine's interaction with the provisions of Maryland's wrongful death statute, MD. CODE, Courts & Jud. Proc. §§ 3-901–04. We will affirm the judgment of the circuit court.

BACKGROUND

In deciding whether the circuit court erred in dismissing the complaint as to Mr. Heidenberg, we assume "the truth of all well-pled facts and allegations in the complaint and any inferences that may be drawn" from them. *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 173 (2015). The operative complaint is Ms. Grier's amended complaint, which alleges in pertinent part that:

At the time of his death, Michaelangelo was twenty-one months of age, and resided with his natural mother, Ms. Grier. Ms. Grier had full and permanent physical custody of Michaelangelo pursuant to a consent order between her and Mr. Heidenberg. Ms. Grier and Mr. Heidenberg had never been married and were living apart from one another when Michaelangelo died.[3]

On the afternoon of July 21, 2016, Michaelangelo went to Mr. Heidenberg's home for visitation. On that day, and unbeknownst to Ms. Grier, Mr. Heidenberg was hosting a party. Among the guests was Ms. Heidenberg. Mr. Heidenberg's home included an in-ground

---

[3] The Court of Appeals has made it clear that the marital status and living arrangements of the parents are irrelevant to the applicability of the parent-child immunity rule. *See Smith v. Gross*, 319 Md. 138, 146 n.5 (1990).

2

pool in the yard behind the house. There was no fence or gate restricting access to the pool. During the course of the party, Michaelangelo somehow fell into the pool and drowned.[4]

The amended complaint asserted that Mr. Heidenberg had a duty to care for and protect Michaelangelo. He breached that duty by failing to undertake reasonable measures to prevent very young children from accessing the pool in his backyard and failing to properly monitor and supervise Michaelangelo during the party. The amended complaint also alleged that, upon information and belief, Ms. Heidenberg undertook to look after

---

[4] The complaint also alleges that, during the party, Mr. Heidenberg was also "having visitation with . . . his older son, Gianni Heidenberg[.]" The amended complaint does not address Gianni's age or his relationship, if any, to Ms. Grier. In his brief to this Court, Mr. Heidenberg asserts that Ms. Grier and Mr. Heidenberg "are also parents to Gianni Heidenberg, who was six years old when his younger brother drowned." Based on this factual premise, Mr. Heidenberg contends that:

> One of those sons continues to live and[] together the three of them are the *family* that is the intended beneficiary of the parent-child doctrine. Those parents, the Appellant and the Appellee, still need to function as a family and exercise their parental rights and duties of care to Gianni.

(Emphasis in original.)

There are problems with this argument. One of them is that Mr. Heidenberg's citations to the extract do not support his assertion that Ms. Grier is Gianni's mother. One citation is to the amended complaint which, as we have explained, is silent on the issue. The other is to a statement made by appellee's counsel to the circuit court during a Rule 2-502 hearing that Gianni "is the child of both of these parents [and] who was the full-blood brother of Michaelangelo Heidenberg[.]" A representation of counsel is not evidence.

With that said, Ms. Grier did not address this argument either in her reply brief or at oral argument. Assuming for purposes of analysis that Mr. Heidenberg's counsel's factual assertion is correct (and we have no reason to believe otherwise), our review is limited to the facts as alleged in the operative complaint and inferences that can be reasonably be drawn from those facts. We decline to engage in the fiction that it is reasonable to infer from an allegation that Gianni is the son of Mr. Heidenberg that he is also the son of Ms. Grier.

Michaelangelo during the party and that she therefore had a duty to monitor and supervise him. The amended complaint alleged that Ms. Heidenberg breached that duty. These breaches of duty, individually and collectively, were the proximate cause of Michaelangelo's death.

## THE PROCEDURAL HISTORY

After the initial complaint was served, Mr. Heidenberg filed a motion to dismiss on the basis that Ms. Grier's claims against him were barred by the doctrine of parent-child immunity.[5] The circuit court, the Honorable Timothy J. McCrone, presiding, denied the motion on March 5, 2018. Mr. Heidenberg filed a notice of appeal. This Court dismissed the appeal on the basis that it "was not allowed by law as a premature appeal from a non-final judgment." *Timothy Heidenberg v. Claudia Grier*, No. 2400, September Term, 2018 (2018). Mr. Heidenberg then filed a petition for a writ of certiorari, which was granted by the Court of Appeals. *Heidenberg v. Grier*, 463 Md. 145 (2019). After briefing and oral argument, the Court dismissed the writ of certiorari as improvidently granted and remanded the case to the circuit court. *Heidenberg v. Grier*, 464 Md. 6 (2019).

In the meantime, Mr. Heidenberg was active at the circuit court level. On July 11, 2018, that is, after the circuit court had received the mandate from the Court of Special Appeals dismissing his premature appeal, he filed a motion pursuant to Md. Rule 2-502 for

---

[5] Ms. Heidenberg filed a separate motion to dismiss. In it, she asserted that the doctrine of parent-child immunity should be extended to grandparents who "assume[] the same responsibility that the law imposes" upon parents. The circuit court denied Ms. Heidenberg's motion on June 28, 2018.

a judicial determination of whether "the Doctrine of Parent-Child Immunity survives the death of a child." The motion for a Rule 2-502 determination was granted on July 31, 2018. On August 28, 2018, the circuit court, the Honorable Mary M. Kramer, presiding, held a hearing on the issue. At the close of the hearing, the court noted that the identical legal issue had been presented to the circuit court in the context of Mr. Heidenberg's motion to dismiss and that Judge McCrone had denied the motion. Judge Kramer stated that she would "adopt Judge McCrone's decision because I don't feel comfortable going behind his work." On October 16, 2018, the court entered an order "denying Mr. Heidenberg's request for a dismissal of the matter against him based on parent-child immunity."

On July 21, 2019, that is, after the Court of Appeals remanded the case to the circuit court, Mr. Heidenberg filed a motion to intervene as a plaintiff and a third-party complaint. In the motion and the complaint, Mr. Heidenberg asserted that, although he denied Ms. Grier's allegations as to his negligence, if a finder-of fact were to conclude that he had breached his duties to Michaelangelo, then he had a right to "damages as a primary beneficiary of Michaelangelo Heidenberg for the wrongful death of his son."

On the same day, Mr. Heidenberg also filed a third-party complaint against Seem Rohit and Karla Manisha. The complaint alleged that Rohit and Manisha were the prior owners of the home where Michaelangelo drowned, that they conveyed the property to Mr. Heidenberg, and that the pool was on the property at the time of sale. Mr. Heidenberg alleged that, at the time of sale, there was no fence or other barrier around the pool to prevent a toddler from having access to it. The complaint asserts that Rohit and Manisha were under a duty to Mr. Heidenberg "to convey the property in a non-injurious/non-

defective condition," or to warn him of the defective and dangerous condition of the pool. He further asserted that this duty extended not only to him but to his guests and invitees as well. The third-party complaint sought indemnification and/or contribution from Rohit and Manisha as well as damages.

On September 3, 2019, Ms. Grier filed her amended complaint. Mr. Heidenberg and Ms. Heidenberg each filed a motion to strike and/or dismiss the amended complaint, asserting, among other things, that the doctrine of parent-child immunity barred Ms. Grier's claims against them.

On November 21, 2019, acting on its own accord and after "further review of statutory and case law," the circuit court entered an order informing the parties that it would revisit its prior decision in the Rule 2-502 proceeding, and scheduling a hearing to permit the parties to address this issue.

During this hearing, in which counsel for all parties participated, Mr. Heidenberg moved to dismiss the amended complaint. At the close of the hearing, the court concluded that the doctrine of parent-child immunity barred Ms. Grier's wrongful death and survival claims against Mr. Heidenberg.

In a written order filed on November 25, 2019, the circuit court:

> (1) granted Mr. Heidenberg's motion to dismiss the amended complaint "as to [him] only,"
>
> (2) denied as moot Mr. Heidenberg's motion to intervene as a plaintiff and another pending motion to dismiss the amended complaint,

6

(3) dismissed Mr. Heidenberg's claims for indemnification and contribution against the third-party defendants,

(4) reserved ruling on the third-party defendants' motion to dismiss Mr. Heidenberg's claim for other damages, and

(5) denied Ms. Heidenberg's motion to strike the amended complaint, and reserved ruling on her motion to dismiss that complaint pending a hearing on the merits of that motion.

After entry of this order, Ms. Grier filed a motion requesting the court to certify its November 25th order as to the application of the doctrine of parent-child immunity to her claim against Mr. Heidenberg as a final judgment pursuant to Md. Rule 2-602(b). Neither Mr. Heidenberg nor Ms. Heidenberg objected to certification. On February 7, 2020, the circuit court granted the motion, setting out its reasons for doing so in a written order. The court explained:

> This case involves allegations of negligence against a parent in a child's drowning death. The family's need for final resolution of this issue is acute. This issue, once resolved on appeal, will either end the case against the parent, or [will] be remanded so that the merits of the case can be addressed. In this instance, the court finds that the interest in having a final decision on the issue of parent child immunity sooner, rather than later, overcomes the interest in avoiding piecemeal appeals.

During oral argument before this Court, Mr. Heidenberg's counsel drew the panel's attention to *Nolasco v. Malcom*, 949 N.W.2d 201 (Neb. 2020), which had been filed after briefing in this case had been concluded, but prior to oral argument. This Court gave the parties permission to file supplemental briefs "addressing the applicability of the analysis

7

and holding in *Nolasco* to this appeal." We will discuss the Nebraska decision in our analysis.

## THE RULE 2-602(B) CERTIFICATION

"It is a 'long-standing bedrock rule of appellate jurisdiction, practice, and procedure that, unless otherwise provided by law, the right to seek appellate review in this Court or the Court of Special Appeals ordinarily must await the entry of a final judgment that disposes of all claims against all parties.'" *Miller Metal Fabrication, Inc. v. Wall*, 415 Md. 210, 220–21 (2010) (quoting *Silbersack v. AC & S, Inc*., 402 Md. 673, 678 (2008)). However, Md. Rule 2-602(b) authorizes a trial court to enter a final judgment "as to one or more but fewer than all of the claims or parties" when the court "expressly determines in a written order that there is no just reason for delay[.]" Certification under Rule 2-602(b) can only be used when a court "made a ruling that disposes of one entire claim or of all claims against a party." Kevin F. Arthur, FINALITY OF JUDGMENTS AND OTHER APPELLATE TRIGGER ISSUES, 69, § 33 (3d ed. 2018) (hereafter "FINALITY OF JUDGMENTS").

Rule 2-602(b) is an exception to "Maryland's strong policy against permitting piecemeal appeals." *Id.* at 70, § 35. The relevant public policy is judicial economy and its purpose "is to benefit the appellate courts." *Murphy v. Steele Software Sys. Corp*., 144 Md. App. 384, 392 (2002). This benefit is realized when appellate courts are not "faced with having the same issues presented multiple times[.]" *Silbersack*, 402 Md. at 679. For these reasons, Rule 2-602(b) certification should be used "'sparingly'" and only in "'the very infrequent harsh case.'" FINALITY OF JUDGMENTS at 70, § 35 (quoting *Md. Nat'l Capital Park & Planning Comm'n v. Smith*, 333 Md. 3, 7 (1993)).

8

Appellate courts review a trial court's certification of an interlocutory judgment pursuant to Rule 2-602(b) for abuse of discretion. *Miller Metal*, 415 Md. at 222. The scope of the circuit court's discretion is, however, "limited." *Smith v. Lead Indus. Ass'n, Inc.*, 386 Md. 12, 25 (2005).

In the present case, we conclude that the circuit court did not abuse its discretion in certifying its judgment as to Ms. Grier's claim against Mr. Heidenberg as final. Final resolution of the parent-child immunity issue in Mr. Heidenberg's favor would resolve Ms. Grier's claim against him. As a practical matter, such a resolution would almost certainly resolve Mr. Heidenberg's claims against Rohit and Manisha, the third-party defendants. We recognize that resolution of the parent-child immunity issue would not be determinative of Ms. Grier's and Mr. Heidenberg's claims against Ms. Heidenberg. But the issue in the present appeal is whether Maryland's *existing* parent-child immunity doctrine should apply in cases in which a minor child dies as the result of a parent's negligence. In contrast, Ms. Heidenberg asserts that the rule of parent-child immunity should be *extended* to apply in cases in which a child dies because of a grandparent's negligence. If the claims against Ms. Heidenberg are tried and the resulting judgment is appealed, the appellate court would not be confronted with addressing the same issue that is raised in the present case.

In her brief, Ms. Grier makes two closely-related arguments:

First, Ms. Grier argues that Maryland's doctrine of parent-child immunity should be abrogated in its entirety. She contends that original policy justifications for parent-child immunity were, at best, dubious, and have been rendered irrelevant by the passage of time and changing societal values. As part of her argument, she summarizes the history of the doctrine of parent-child immunity in the United States generally and in Maryland specifically. Ms. Grier points out that, although a number of jurisdictions adopted parent-child immunity in the late nineteenth and early twentieth centuries, courts in many jurisdictions have since either abrogated the doctrine or restricted its scope.

Second, she asserts that the circuit court erred when it ruled that the doctrine of parent-child immunity barred her wrongful death claim. According to her, the justifications for parent-child immunity are not relevant in cases, such as the present one, where a child dies as a result of a parent's negligence. Pointing to a series of decisions by the Court of Appeals beginning with *Mahnke v. Moore*, 197 Md. 61 (1951), and culminating in *Bushey v. Northern Assurance Co. of America*, 362 Md. 626 (2001), Ms. Grier directs our attention to Judge Eldridge's concurring opinion in *Bushey* where he stated that "where there exists no ongoing parent-minor child relationship to be disrupted, there is utterly no reason to apply the doctrine." *Bushey*, 362 Md. at 659 (Eldridge, J., concurring).

In making this argument, Ms. Grier recognizes that the Court of Appeals held that parent-child immunity applied in a case in which a child died as a result of a parent's negligence. *Smith v. Gross,* 319 Md. 138, 148–49 (1990). She contends that *Smith v.*

10

*Gross*'s holding was "abrogated" by the Court of Appeals in *Mummert v. Alizadeh*, 435 Md. 207, 230 (2013). She states:

> In sum, and considering Maryland case law on the issue in whole, the inescapable conclusion is that the Wrongful Death Statute is a wholly independent cause of action for which the defense of parent-child immunity—which expired with Michaelangelo's death—cannot be employed to defeat the claims of his surviving statutory beneficiaries.

Ms. Grier acknowledges that the survival claim "presents a more difficult situation." She concedes that, "had Michaelangelo been merely injured . . . he would have no cause of action against his father, due to the application of parent-child immunity." She asserts that "this common law, judicially created doctrine exists solely for the public policy purpose of preserving the integrity and authority of the parent-child relationship. It serves no purpose, and has no application, in the case where either parent or child dies, and there is no longer a relationship to protect." Therefore, she concludes, we should permit the survival claim to go forward.

Mr. Heidenberg agrees with none of this. He asserts that the concept of parent-child immunity has been firmly ensconced in Maryland law since it was first applied by the Court of Appeals in *Schneider v. Schneider*, 160 Md. 18 (1930). He points out that, on several occasions, both the Court of Appeals and the Court of Special Appeals have been asked to abrogate the doctrine and have consistently refused to do so, but the General Assembly has modified the scope of the immunity in motor vehicle accident cases.[6] He concedes that

---

[6] The statute in question is codified as MD. CODE, Courts & Jud. Proc. § 5-806. The Court of Appeals analyzed § 5-806's legislative history in *Macedo v. Auto. Ins. Co. of*

(continued)

11

"there have been many changes in the world" since *Schneider* was filed but what "has not changed is the need for parents to parent their children and the aspiration that families will be supported and nurtured by all family members." It is his position that:

> The current state of the law in Maryland is that parent-child immunity provides absolute immunity to parents of unemancipated children for their negligent acts or omissions that result in injury to or wrongful death of their children, unless the injury or death arose out of the operation of a motor vehicle and there is a motor vehicle insurance policy that provides liability coverage or uninsured motor vehicle coverage for the parent's negligence. Not only have the appellate courts continuously affirmed the viability of parent-child immunity, but the Legislature has directly recognized the doctrine and implicitly affirmed its place in the common law of Maryland.

Mr. Heidenberg argues that Ms. Grier draws the wrong lessons from *Bushey v. Northern Assurance Co.*, *Smith v. Gross*, *Mummert v. Alizadeh*, and *Spangler v. McQuitty*. It is his position that, individually and collectively, none of these cases affect the parent-child immunity doctrine in ways that are relevant to the issues in this appeal.

THE STANDARD OF REVIEW

When reviewing the grant of a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the appropriate standard of review "is whether the trial court was legally correct." *Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 284 (2018). Appellate courts "review the grant of a motion to dismiss de novo [and will] affirm the circuit court's judgment on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised." *Sutton v.*

---

*Hartford*, ___ Md. ___, No. 52, Sept. Term, 2021, 2022 WL 3269743, at *10–13 (Aug. 11, 2022).

12

*FedFirst Fin. Corp.*, 226 Md. App. 46, 74 (2015) (cleaned up), *cert. denied*, 446 Md. 293 (2016).

In this exercise, an appellate court:

> must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. Consideration of the universe of "facts" pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any.

*RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643 (2010) (cleaned up).

## ANALYSIS

Our analysis consists of several parts:

First, and in order to provide context for our discussion of the relevant Maryland cases, we will briefly review the development of the doctrine of parent-child immunity in other jurisdictions from its initial articulation in *Hewlett v. George*, 68 Miss. 703 (1891), through the 2020 decision of the Supreme Court of Nebraska in *Nolasco v. Malcom*, 949 N.W.2d 201 (Neb. 2020).

Second, we will discuss the history of parent-child immunity in Maryland, beginning with *Schneider v. Schneider*, 160 Md. 18 (1930), and address Ms. Grier's argument that we should abrogate the doctrine of parent-child immunity.

Third, we will review decisions by the Court of Appeals addressing the interaction of the parent-child immunity doctrine and the provisions of Maryland's wrongful death statute

13

to decide whether Ms. Grier can pursue her wrongful death and survival claims against Mr. Heidenberg under the facts alleged in the amended complaint.

From all of this, we conclude that the current state of Maryland law is that the primary public policies furthered by the parent-child immunity are shielding from judicial interference matters relating to family integrity, harmony, and the exercise of parental discretion in the discipline and care of children. The Court of Appeals and this Court have repeatedly declined to abrogate the doctrine. The Maryland case that is most factually similar to the one before us is *Smith v. Gross*, in which the Court of Appeals held that parent-child immunity applied in a case in which a child died as a result of a parent's negligence. 319 Md. at 148–49. Ms. Grier's contention that this holding was abrogated or otherwise undermined in *Bushey* and *Mummert* is not persuasive.

1. The parent-child immunity doctrine in the United States

In contrast to the doctrine of interspousal immunity,[7] whose conceptual origins were deeply embedded in English common law, "there is nothing in the English decisions to suggest that at common law a child could not sue a parent for a personal tort." *Mahnke v. Moore*, 197 Md. 61, 64 (1951).[8]

---

[7] The history of interspousal tort immunity in Maryland is summarized in *Lusby v. Lusby*, 283 Md. 334, 337–46 (1978). *Lusby* was the first of a series of decisions by the Court of Appeals in which the scope of the immunity was incrementally narrowed. This process culminated in *Bozman v. Bozman*, 376 Md. 461, 497 (2003), in which the Court abrogated the doctrine in its entirety after characterizing it as "a vestige of the past, whose time has come and gone[.]"

[8] By the same token, there was very little in English common law to suggest that a child could do so. *See* William E. McCurdy, *Torts Between Persons in Domestic Relation*,

(continued)

14

The doctrine of parent-child immunity originated in three decisions from the late 19th and early 20th centuries: *Hewlett v. George*, 9 So. 885 (Miss. 1891); *McKelvey v. McKelvey*, 77 S.W. 664 (Tenn. 1903); and *Roller v. Roller*, 79 P. 788 (Wash. 1905). *See* Gail D. Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification*, 50 FORDHAM L. REV. 489, 495 (1982) (characterizing *Hewlett*, *McKelvey*, and *Roller* as the "'great trilogy'" that established the doctrine of parent-child immunity in the United States. (quoting Comment, *Tort Actions Between Members of the Family-Husband & Wife-Parent & Child*, 26 MO. L. REV. 152, 182 n.41 (1961)).

At issue in *Hewlett v. George* was a minor's claim against her mother's estate for damages based on the assertion that the mother had improperly arranged for the daughter to be committed to a mental hospital. The Court held that the daughter had no cause of action. It explained:

> [S]o long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand.

43 Harv. L. Rev. 1030, 1059 (1930) (hereafter "McCurdy I") (characterizing the caselaw and scholarly authorities relating to a child's right to sue a parent for a physical injury prior to 1891 as "meager, conflicting, and obscure").

In contrast, causes of action between parents and minor children regarding claims to property interests were "freely recognized" at common law. McCurdy I at 1057–58.

15

*Hewlett*, 9 So. at 887. As many courts and commentators have subsequently observed, the *Hewlett* Court cited no authority for its conclusion.

In *McKelvey v. McKelvey*, the Court relied exclusively on *Hewlett* in holding that a minor child had no cause of action against her father and stepmother for "cruel and inhuman treatment." 77 S.W. at 664.

Finally, in *Roller v. Roller*, 79 P. 788 (Wash. 1905), and also relying on *Hewlett,* the Court held that a child could not sue her father for sexually assaulting her. The Court conceded that the father's conduct was "heinous" but opined that "there is no practical line of [demarcation] which can be drawn [between such behavior and] any other tort." *Id.* at 789. In addition to the policy considerations identified in *Hewlett*, the Washington Supreme Court identified two additional reasons why recovery should not be permitted. The first was "if a child should recover a judgment from a parent, in the event of its death the parent would become heir to the very property which had been wrested by the law from him," and the second was a concern that the tortfeasor's assets "which [otherwise are] for the support of all the minor children, [would be] appropriated by any particular one." *Id.*[9]

---

[9] The holdings in each of these decisions have been modified:

In *Glaskox ex rel. Denton v. Glaskox*, 614 So.2d 906, 912 (Miss. 1992), the Court held that the doctrine of parent-child immunity enunciated in *Hewlett* did not apply to motor vehicle negligence cases. *See also Smith v. Holmes*, 921 So.2d 283, 285 (Miss. 2005) (explaining that *Glaskox*'s holding was limited to cases involving the negligent operation of motor vehicles).

In *Broadwell by Broadwell v. Holmes*, 871 S.W.2d 471, 476–77 (Tenn. 1994), the Court limited the scope of parent-child immunity to claims that arise out of "the exercise

(continued)

16

It was not long before courts in many jurisdictions applied the doctrine of parent-child immunity to bar claims based on assertions of negligence, including motor vehicle accident cases.[10] *See* McCurdy I, 43 HARV. L. REV. at 1064–68 (collecting cases). In this process, various courts identified a variety of additional policy justifications for the doctrine. *Id.* at 1072–77.[11] In the ensuing years, appellate courts in forty-nine states, as well as the District of Columbia, have addressed whether the doctrine of parent-child immunity was applicable

---

of parental authority, the performance of parental supervision, and the provision of parental care and custody."

Finally, in *Borst v. Borst*, 251 P.2d 149, 156 (Wash. 1952) (in banc), the Washington Supreme Court limited parent-child immunity to claims arising from a defendant's "discharge of parental duties."

[10] The first reported appellate decision addressing parent-child immunity in the context of a motor vehicle accident appears to be *Small v. Morrison*, 118 S.E. 12, 16 (N.C. 1923).

[11] In his 1930 article, Professor McCurdy identified seven reasons relied upon by one or more courts: (1) the "danger of fraud" inherent in an action by a child against its parents upon reaching adulthood; (2) the possibility that the tortfeasor might, through the death of the victim, inherit some or all of the damage award; (3) requiring a parent to pay damages to one injured child might deplete funds available for the support of other children; (4) the notion that children should not be permitted to recover damages when a spouse could not because of marital immunity; (5) the prospect that litigation between a child and a parent would destroy the "harmony and peace" of family relations; (6) a concern that permitting children to sue parents would impinge upon the authority of parents as heads of households; and (7) a concern that permitting actions for damages would infringe upon parents' ability to discipline and control their children. McCurdy I at 1072–77. It was his view that each of these rationales was flawed. *Id.*

He concluded that "the problem of a cause of action for personal injury should be considered an open question, meriting a more careful and exhaustive analysis, a more critical appreciation of the factors involved, and a more rational treatment than it has received in the past." *Id.* at 1082.

in negligence cases when the tortfeasor and the victim were parent and child.[12] Eventually, the doctrine was adopted by appellate courts in most states.

Its general acceptance notwithstanding, the doctrine of parent-child immunity has long had its share of critics.[13] Among the early challenges to the validity of the justifications for the doctrine were Professor McCurdy's 1930 Harvard Law Review article and an opinion of the Supreme Court of New Hampshire that pointed out a variety of flaws in the conceptual justifications for the doctrine. *Dunlap v. Dunlap,* 150 A. 905, 907–15 (N.H. 1930).[14] In 1965, the American Law Institute rejected the concept of parent-child immunity. *See* RESTATEMENT (SECOND) OF TORTS § 895G (1965) comments a.–j. Additionally, courts in many states expressed reservations about the policy justifications and the scope of the parent-child immunity rule articulated in *Hewlett.* As a result, "[b]y

---

[12] South Dakota is the exception. *See Brunner v. Hutchinson Div., Lear-Siegler, Inc.*, 770 F. Supp. 517, 522 (D. S.D. 1991) ("South Dakota has never explicitly adopted or rejected the parental immunity doctrine[.]").

[13] Three informative analyses of the scholarly and judicial debates regarding parent-child immunity are: Sandra L. Haley, *The Parental Tort Immunity Doctrine: Is It a Defensible Defense?*, 30 U. RICH. L. REV. 575 (1996); Gail D. Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification*, 50 FORDHAM L. REV. 489 (1982); and Professor McCurdy's follow-up to his 1930 article, William E. McCurdy, *Torts Between Parent and Child*, 5 VILLANOVA L. REV. 521 (1960) ("hereafter "McCurdy II").

[14] In *Mahnke v. Moore*, 197 Md. 61, 66–67 (1951), the Court of Appeals characterized *Dunlap* as a "landmark" decision that "repudiated" the "absolute rule" enunciated in *Hewlett v. George*.

the mid-20th century, jurisdictions began to reexamine the blanket doctrine" announced in

*Hewlett. Nolasco*, 949 N.W.2d at 205.[15]

What makes the *Nolasco* opinion useful for us is the Nebraska Supreme Court's

analysis of the development of the parent-child immunity doctrine beginning with *Hewlett.*

*Id.* at 204–11. The Nebraska Court identified *Goller v. White*, 122 N.W.2d 193 (Wis. 1963),

as the watershed appellate decision in the process that led to the doctrine's abrogation or

modification in many jurisdictions. In *Goller*, the Wisconsin Supreme Court abrogated the

doctrine of parent-child immunity with two exceptions:

> (1) where the alleged negligent act involves an exercise of parental authority
> over the child; and (2) where the alleged negligent act involves an exercise
> of ordinary parental discretion with respect to the provision of food, clothing,
> housing, medical and dental services, and other care.

122 N.W.2d at 198.

The *Nolasco* court explained that:

> After *Goller*, a few states chose to maintain blanket parental immunity, but
> most jurisdictions moved away from blanket immunity and narrowed the
> practical application of the doctrine by recognizing a wide variety of
> exceptions and limitations. The most commonly recognized limitation has
> been to allow suits against parents for the negligent operation of an
> automobile. Some states adopted a *Goller*-like approach and limited the
> doctrine to bar tort claims only when the negligent conduct at issue is
> inherent to the parent-child relationship, such as the exercise of parental
> authority, supervision, care, or discipline. Some states have abolished the
> doctrine in toto, and others have replaced it with either a "reasonable parent"

---

[15] The issue in *Nolasco* was whether Nebraska's version of the parental immunity doctrine should be abrogated in its entirety or modified to permit motor vehicle negligence actions. 949 N.W.2d at 211. Ultimately, the Nebraska Supreme Court declined to address the first contention and answered "yes" to the second. *Id*. at 212, 213.

rule or the approach followed by the Restatement (Second) of Torts [§ 895G].

949 N.W.2d at 205–07 (footnotes omitted).[16]

In conclusion, and in extremely broad strokes, eight jurisdictions in the United States never adopted the doctrine of parent-child immunity.[17] The remaining states, whether by

---

[16] Cases holding that a child has the right to sue a parent for injuries caused by the parent's negligent operation of a motor vehicle include *Nolasco*, 949 N.W.2d at 213; *Glaskox by & through Denton v. Glaskox*, 614 So.2d 906, 912 (Miss. 1992); *Transamerica Ins. Co. v. Royle*, 656.2d 820, 824 (Mont. 1983); and *Sorensen v. Sorensen*, 339 N.E.2d, 907 (Mass. 1975).

Decisions that have the abrogated categorical parent-child immunity enunciated in *Hewlett* while retaining an immunity restricted to cases where the negligent act was either "inherent to the parent-child relationship" or arose out of an ordinary exercise of parental decision-making include: *Gross v. Sears, Roebuck & Co.*, 386 A.2d 442, 445 (N.J. Super. Ct. App. Div. 1978); *Plumley v. Klein*, 199 N.W.2d 169, 172–73 (Mich. 1972); and *Gibson v. Gibson*, 479 P.2d 648 (Cal. 1971).

Decisions applying the "reasonable parent rule" articulated in Restatement (Second) of Torts § 895G include: *Hartman by Hartman v. Hartman*, 821 S.W.2d 852, 858 (Mo. 1991); and *Anderson v. Stream*, 295 N.W.2d 595, 601 (Minn. 1980).

Finally, courts in a number of states have held that the doctrine of parent-child immunity does not apply in cases involving various types of intentional misconduct. *See*, *e.g.*, *Henderson v. Woolley*, 644 A.2d 1303, 1307 (Conn. 1994) (sexual abuse); *Mitchell v. Davis*, 598 So.2d 801, 803–04 (Ala. 1992) (same); *McGee v. McGee*, 936 S.W.2d 360, 367 (Tex. App. 1996) (intentional or malicious acts); *Doe by & through Connolly v. Holt*, 418 S.E.2d 511, 514 (N.C. 1992) (willful and malicious acts); *Nolasco*, 949 N.W.2d at 204, 209 (Nebraska's "'modified version' of the parental immunity doctrine adopted in other jurisdictions" does not extend to claims based upon "brutal, cruel or inhuman treatment." (citing *Pullen v. Novak*, 99 N.W.2d 16, 25 (Neb. 1959)).

[17] The jurisdictions have explicitly declined to adopt the parent-child immunity doctrine are: Alaska, *Hebel v Hebel*, 435 P.2d 8, 15 (Alaska 1967); the District of Columbia, *Rousey v. Rousey*, 528 A.2d 416, 416 (D.C. 1987); Hawaii, *Petersen v. City and County of Honolulu*, 462 P.2d 1007, 1008–09 (Haw. 1969); Nevada, *Rupert v. Stienne*, 528

(continued)

judicial decision or legislation, have either abrogated the doctrine in favor of more narrowly-tailored concepts of immunity, or have retained the doctrine while recognizing exceptions to it. As we will now explain, Maryland falls into the latter category.

## 2. The parent-child immunity doctrine in Maryland

The Court of Appeals first addressed parent-child immunity in *Schneider v. Schneider*, 160 Md. 18 (1930), in which a passenger in an automobile involved in an accident sued the driver of the vehicle, who was her unemancipated minor son. *Id.* 19–20. In concluding that the mother had no cause of action, the Court of Appeals pointed to *Hewlett*, *McKelvey*, *Roller*, and similar cases as establishing that "a minor child cannot maintain such an action against its parent." *Id.* at 22. The Court held that the reciprocal was also correct—a parent could not maintain an action against a minor child:

> It seems clear [that] one person cannot at the same time occupy the position of parent and natural guardian, fulfilling the functions devolved upon that position, and the position of plaintiff demanding damages from the child at law. We need not dwell upon the importance of maintaining the family relation free for other reasons from the antagonisms which such suits imply.

*Id.* at 23–24 (cleaned up).[18]

---

P.2d 1013, 1017 (Nev. 1974); North Dakota, *Nuelle v. Wells*, 154 N.W.2d 364 (N.D. 1967); Utah, *Bishop v. Nielsen*, 632 P.2d 864, 865 (Utah 1981); and Vermont, *Wood v. Wood*, 370 A.2d 191, 193 (Vt. 1977). The eighth jurisdiction is South Dakota which, as we previously explained, does not appear to have addressed the issue. *See* ftn. 12, *supra*; *Brunner v. Hutchinson Div., Lear-Siegler, Inc.*, 770 F. Supp. 517, 519 (D. S.D. 1991).

[18] *Schneider* appears to have been the first appellate decision extending the parent-child immunity doctrine to claims asserted by parents. McCurdy II, 5 VILLANOVA L. REV. at 537.

In *Schneider*, the Court of Appeals "fashioned a broad reciprocal immunity under which parents and children could not assert *any* claim for civil redress." *Macedo v. Auto. Ins. Co. of Hartford, Connecticut*, No. 52, ___ Md. ___, Sept. Term, 2021, 2022 WL 3269743, at *10 (Md. Aug. 11, 2022) (quoting *Warren v. Warren*, 336 Md. 618, 622 (1994) (emphasis in *Warren*)). In the ninety years since *Schneider* was filed, Maryland's appellate courts have dealt with the parent-child immunity doctrine in a variety of legal and factual contexts. We will focus on the decisions that are relevant to the issues raised in this appeal.

In *Mahnke v. Moore*, 197 Md. 61, 67 (1951), a father shot and killed the mother of his five-year-old daughter in her presence and, about a week later, shot and killed himself, again in her presence. The child's maternal grandfather, as her guardian and next friend, filed suit against the father's estate for damages for "shock, mental anguish and permanent nervous and physical injuries." *Id.* at 63. The circuit court dismissed the action on the basis of parent-child immunity. *Id.* at 64.

In reversing the judgment, the Court of Appeals began with the premise that "there is nothing in the English decisions to suggest that at common law a child could not sue a parent for a personal tort." *Id.* The Court then reviewed the development of the doctrine of parent-child immunity in the United States starting with *Hewlett v. George* and including *McKelvey v. McKelvey*, and *Roller v. Roller*. *Id.* at 65–66. The Court concluded that the doctrine did not apply to the case before it because "there is no home at all in which discipline and tranquillity are to be preserved." *Id.* at 68. The Court continued:

> Ordinarily, the parent is not liable for damages to the child for a failure to perform a parental duty, or for excessive punishment of the child not maliciously inflicted. . . . These acts grow out of and pertain to the relation

22

of parent and child. But when, as in this case, the parent is guilty of acts which show complete abandonment of the parental relation, the rule giving him immunity from suit by the child, on the ground that discipline should be maintained in the home, cannot logically be applied, for when he is guilty of such acts he forfeits his parental authority and privileges, including his immunity from suit. Justice demands that a minor child shall have a right of action against a parent for injuries resulting from cruel and inhuman treatment or for malicious and wanton wrongs.

*Id.*

*Eagan v. Calhoun*, 347 Md. 72 (1997), presented a variation on the facts in *Mahnke*. The factual distinction between the two cases is that the father, Calhoun, did not commit suicide after killing his wife and his children's mother. *Id.* at 77–78. Calhoun was charged with second-degree murder and entered into a plea bargain whereby he pled guilty to manslaughter in return for a five-year prison sentence. *Id.* at 78. At the time of the homicide, the Calhouns had two children aged eleven and nine. *Id.* at 79. While incarcerated, Calhoun consented to a court order appointing guardians for the persons and property of the children. *Id.* at 84. The custodian filed a wrongful death action on the children's behalf against Calhoun, who asserted that the claim was barred by the parent-child immunity doctrine. *Id.* at 79. He sought to distinguish *Mahnke* by asserting that he still cared for his children and looked forward to re-establishing a relationship with them after his release from incarceration. *Id.* at 81. For these reasons, he said, his case was different from *Mahnke. Id.* In rejecting this contention, the Court of Appeals elaborated on its holding in *Mahnke* and the reasoning behind it (emphasis added):

Although, as we have indicated, *Mahnke v. Moore* presented some most unusual and egregious conduct, the underpinning of our decision was not limited to those facts. . . . When the conduct giving rise to the action is of

23

such a nature to have, itself, destroyed the family harmony and significantly eroded any realistic prospect of parental control and discretion, and there is no indication of fraud or collusion or the risk of depleting resources that otherwise would be devoted to the family unit, there is no longer any justification for the immunity and therefore no logical or public policy reason to apply it.

*Those circumstances do not necessarily arise merely because culpable conduct causes the death of a family member*, and we therefore, expressly, do not extend the Mahnke v. Moore exception to every wrongful death case. . . . A parent who negligently causes the death of his or her spouse or of a child can still maintain a parent-child relationship; the family, even in its grief, can survive. *Thus, the mere fact that death is the consequence of the conduct is not a reason to discard the doctrine*.

When the death is occasioned by murder or voluntary manslaughter, however, any remaining relationships are far more likely to be sufficiently shattered to be beyond further impairment by a lawsuit. The blow is not just the death itself, or even the hard fact that it was caused by the other parent, but rather *that the killing was intentional and not the product of mere carelessness*.

347 Md. at 83–84.

In *Boblitz v. Boblitz*, 296 Md. 242, 275 (1983), the Court of Appeals abrogated the doctrine of interspousal immunity in negligence cases.[19] Three years later, in *Frye v. Frye*, 305 Md. 542, 544–45 (1986), the Court of Appeals considered whether, in light of its decision in *Boblitz* and decisions from other states relating to parent-child immunity, Maryland should (1) abrogate the doctrine in its entirety or (2) create an exception for negligence actions arising out of the operation and use of motor vehicles. The Court declined to do either. *Id.* at 567. Observing that "[t]he light of *Boblitz* shines but dimly on

---

[19] *Boblitz* was the second in a series of decisions by the Court of Appeals that narrowed the scope of interspousal tort immunity in Maryland. *See* n. 7, *supra*.

the parent-child immunity rule," *id.* at 557, the Court reviewed developments in Maryland law since *Schneider* including the enactment of the Family Law Article in 1984. The Court concluded that:

> The fifty-four years which have elapsed since *Schneider* have been marked by shifting values in a changing world. But both this Court and the legislature have been faithful to the promotion of the stability, harmony and peace of the family and to the preservation of parental authority and the family unity as a matter of public policy in the best interests of society. . . . It is clear that today's parent-child relationship, as recognized by this Court and the legislature, furnishes no compelling reason to abrogate the rule.

*Id.* at 561.

The *Frye* Court also declined to carve out an exception of the parent-child immunity doctrine for motor vehicle negligence actions:

> Compulsory motor vehicle liability insurance, however, is exclusively a creature of the legislature. It reflects a public policy recognized by the General Assembly and is an integral part of an elaborate scheme constructed by the legislature for the general welfare and protection of the People of this State. The exclusion of motor torts from the parent-child immunity rule would inevitably have some impact on the insurance scheme and the social policy it furthers. . . . Whether the exclusion would carfuffle the legislature's insurance scheme, and, if so, to what extent, is properly a matter for the legislature.

*Id.* at 567 (cleaned up).

In *Warren v. Warren*, 336 Md. 618, 626–628 (1994), the Court was presented with essentially the same contentions that were raised in *Frye* and reached the same results for the same reasons. Three years after *Warren* was filed, the Court revisited these issues yet again in *Renko v. McLean*, 346 Md. 464 (1997). After reviewing the development of

25

parent-child immunity in Maryland and throughout the country, *id.* at 468–80, the Court stated:

> In light of the foregoing observations and on balance, we remain convinced that the parent-child immunity rule "is still in the best interests of both children and parents to retain . . . [and that] [a]brogating immunity would result only in further discord within the family and would interfere with the exercise of parental discretion in raising and disciplining children."

*Id*. at 480–81 (quoting *Warren*, 336 Md. at 626).

In response to the *Renko* decision, the General Assembly "immediately renewed efforts to create such an exception by statute." *Allstate Ins. Co. v. Kim*, 376 Md. 276, 283 (2003). These efforts came to fruition in 2001, when the General Assembly enacted what was codified as Courts & Jud. Proc. § 5-806, which now provides (emphasis added):

> The right of action by a parent or the estate of a parent against a child of the parent, or by a child or the estate of a child against a parent of the child, for wrongful death, personal injury, or property damage arising out of the operation of a motor vehicle, as defined in Title 11 of the Transportation Article, *may not be restricted by the doctrine of parent-child immunity* or by any insurance policy provisions, up to the limits of motor vehicle liability coverage or uninsured motor vehicle coverage.

Currently, there are four exceptions to the parent-child immunity doctrine in Maryland. One is the statutory modification enacted by the General Assembly in 2001, and amended in 2005, which is codified as Courts & Jud. Proc. § 5-806. The remaining three were established by the Court of Appeals. *Macedo*, 2022 WL 3269743 at *10 n.4. Two of these are not relevant to the present case: Parent-child immunity does not apply in actions when the parent and the child were adults at the time of the tortious conduct. *Waltzinger v. Birsner*, 212 Md. 107, 126 (1957). Nor does parent-child immunity bar a negligence action

26

by a minor child against a business partner of a parent for injuries received while working at the partnership's business. *Hatzinicolas v. Protopapas*, 314 Md. 340, 358 (1988).

The fourth exception is that the parent-child immunity does not apply where, as a result of the tortfeasor's criminal conduct, "any remaining [family] relationships are . . . likely to be sufficiently shattered to be beyond further impairment by a lawsuit." *Eagan*, 347 Md. at 83; *see also Mahnke*, 197 Md. at 68.

With this as a background, we turn to Ms. Grier's contentions.

### 3. Should Maryland abrogate the parent-child immunity doctrine?

Ms. Grier's first argument is that the doctrine of parent-child immunity should be abrogated in Maryland in its entirety. She asserts that the justifications for parent-child immunity were either invalid or have been rendered irrelevant by changing societal values. She also points to the fact that the majority of the jurisdictions that have considered the matter have abrogated the categorical, all-encompassing version of the parent-child immunity doctrine as it was initially articulated in *Hewlett*, *McKelvey*, and *Roller*. But judicial and academic criticisms of the parent-child immunity doctrine are not new. In fact, two of the most trenchant of them, namely, the opinion of the New Hampshire Supreme Court in *Dunlap v. Dunlap*, and Professor McCurdy's 1930 law review article, were cited by the Court of Appeals in *Schneider*, 160 Md. at 22.

Both this Court and the Court of Appeals have declined to abrogate parent-child immunity on repeated occasions, most recently in *Bushey v. Northern Assurance Co. of America*, 362 Md. 626, 645 (2001); *see also Macedo*, ___ Md. at ___, 2022 WL 3269743 at *10 (observing that "Although Maryland was increasingly isolated in its attachment to

27

this doctrine, this Court 'steadfastly refused to abolish it[.]'" (quoting *Allstate Insurance Co. v. Kim*, 376 Md. at 281)).[20] Assuming for purposes of analysis that the principle of *stare decisis* and our role as an intermediate appellate court would permit us to do so, Ms. Grier has not convinced us that societal mores, expectations, and values have changed sufficiently since 2001 for us to abrogate the doctrine of parent-child immunity in its entirety.[21]

### 4. Can parent-child immunity be raised as a defense in wrongful death actions?

Ms. Grier asserts that, in light of existing Maryland caselaw and the facts of this case, Mr. Heidenberg is precluded from asserting parent-child immunity as a defense. This contention consists of two parts. The first is that defendants in wrongful death actions are precluded as a matter of law from raising parent-child immunity because "parent-child immunity does not survive the death of the child." The second is that Maryland's wrongful death statute, codified at Courts & Jud. Proc. §§ 3-901–904, "is a wholly independent cause of action [in] which the defense of parent-child immunity—which expired with

---

[20] The Court of Special Appeals decisions are *Calhoun v. Eagan*, 111 Md. App. 362, 382–83 (1996), *vacated*, 347 Md. 72 (1997); *Kitz v. Kitz*, 52 Md. App. 136, 139 (1982); *Montz v. Mendaloff*, 40 Md. App. 220, 224 (1978); *Sanford v. Sanford*, 15 Md. App 390, 395 (1972); and *Latz v. Latz*, 10 Md. App. 720, 730 (1971).

[21] In reaching this result, we are aware that a respected and frequently cited treatise on Maryland tort law suggests that this State should abandon the doctrine of parental immunity. RICHARD J. GILBERT & PAUL T. GILBERT, MARYLAND TORT LAW HANDBOOK § 23.4 (2019). Additionally, another respected and frequently cited scholar on tort law has criticized the conceptual justifications for parent-child immunity. Dan B. Dobbs, *et al.*, HORNBOOK ON TORTS § 23.2 (2d ed. 2016). But we are not writing on a blank slate.

28

Michaelangelo's death—cannot be employed to defeat the claims of his surviving statutory beneficiaries." Neither of these contentions is persuasive.

As background, Courts & Jud. Proc. § 3-902 provides that a wrongful death action "may be maintained against a person whose wrongful act causes the death of another." For the purposes of the statute, a "wrongful act" is "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Courts & Jud. Proc. § 3-901(e). The Court of Appeals has made it clear that Maryland's wrongful death statute "allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence." *Spangler v. McQuitty*, 449 Md. 33, 53 (2016) ("*Spangler III*").[22]

The Court first addressed the relationship between the parent-child immunity doctrine and the wrongful death statute in *Smith v. Gross*, 319 Md. 138 (1990). The decedent in the case was a young child who died as a result of an accident caused by his father's negligent operation of an automobile. *Id.* at 140–41. The child's mother filed an action against the father, asserting wrongful death and survival claims. The father argued that the claims were barred by the doctrine of parent-child immunity. *Id.* at 144–45.

In framing its analysis, the Court stated that:

> The survival statute and the wrongful death statute have in common the authorization to commence and prosecute a personal action after the death of

---

[22] To distinguish it from *McQuitty v. Spangler*, 410 Md. 1 (2009) ("*Spangler I*"), and *McQuitty v. Spangler*, 424 Md. 527 (2012) ("*Spangler II*").

the decedent if the decedent[4] might have maintained the action when he was alive.

> [4] Early on, we accepted the term "injured party," in the wrongful death statute as meaning the "decedent," and we have been consistent in that interpretation. *See N.C.R.R. Co. v. State, Use of Burns*, 54 Md. 113 (1880); *State v. Consol. Gas, etc., Co.*, 146 Md. 390 (1924); *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656 (1983). See also *Burke v. United States*, 605 F. Supp. 981[, 988] ([D. Md. 1985]):
>
>> The Maryland law appears to be that if a decedent could not have brought a cause of action for injury at the time of death, the wrongful death action similarly is precluded.[23]

In response, the mother argued that "there wasn't any parental relationship" between the deceased child and her father because the parents were never married to one another and they never resided in the same household. *Id.* at 147. The Court did not agree:

> It does not follow that merely because the parents' relationship had not culminated in marriage and because the mother, the father, and the child did not reside together in a common home, there was no family relationship within the ambit of the rule between the father and the child. Rights and obligations, privileges and duties—the elements of parenthood—existed between the father and child[.] The maintenance of a common home is not the sine qua non of the elements of parenthood. The primary requisite of a father-child relationship is not that a person reside with the child but that the person is, in fact, the father of the child. It is by reason of being the father that certain rights, privileges, obligations, and duties arise.
>
> \*   \*   \*
>
> Under the circumstances revealed in the record before us, we hold that the parent-child immunity rule was applicable during the life of the child. While

---

[23] Ms. Grier asserts that *Smith v. Gross* was "abrogated" by the Court of Appeals in *Mummert v. Alizadeh*, 435 Md. 297 (2013). *Smith v. Gross*'s footnote 4 is at the heart of this contention. We will address this later in our analysis.

> the child was alive, the father was entitled to the immunity which the rule affords.

*Id.* at 147–48.

The Court concluded that "[t]he death of the child did not serve to remove the immunity dictated by the rule and resurrect the action." *Id.* at 150.[24]

The Court of Appeals next addressed these issues in *Bushey v. Northern Assurance Co. of America*. In that case, Susan Bushey was involved in an accident while driving an automobile in which her younger sister Miranda was a passenger. 362 Md. at 629. (It appears from the Court's analysis that both children were minors.) Susan died within minutes; Miranda was taken to a hospital and died five days later. *Id.* In their capacity as personal representatives of Miranda's estate, the parents filed a wrongful death and survivor action against the estate of Susan. *Id.* at 630. The parents also asserted that they were entitled to underinsured motorists benefits under a policy issued to the father's business. *Id.* Among the several defenses raised by the insurer was that the claims were barred by the doctrine of parent-child immunity. *Id.* at 644.

In response, the parents raised two contentions. The first was that the Court should abrogate the parent-child immunity doctrine, an invitation that the Court declined. *Id.* at 645. The second contention was that parent-child immunity did not apply because Susan, the driver of the vehicle, died minutes after the accident, while Miranda passed away five

---

[24] In arguing otherwise, Ms. Grier points to Judge Eldridge's dissenting opinion in *Smith v. Gross*, 319 Md. at 150–51, and his concurring opinion in *Bushey v. Northern Assurance Co. of America*, 362 Md. at 650–51. In each, Judge Eldridge made cogent points, but we are bound by the majority opinions.

days later. *Id.* Therefore, asserted the parents, "the public policy which the immunity is intended to support is non-existent under the circumstances of the instant matter where there is no family relationship to preserve because the alleged tortfeasor is dead." *Id.* at 645–46.

In assessing this contention, the Court first noted that, in the case before it "the injured person is Miranda and the alleged tortfeasor is Susan. If death had not ensued Miranda could sue Susan. There is no inter-sibling immunity." *Id.* at 647. The Court reviewed its reasoning in *Eagan v. Calhoun* and *Smith v. Gross*, and concluded:

> [T]he effect of *Eagan* when coupled with *Gross* is that, in addition to the need of the plaintiff to satisfy the condition of the wrongful death statute, i.e., that the claim be one which the injured person could have brought had death not ensued, *this Court will also look to the relationship between the beneficial plaintiff and the tortfeasor in a wrongful death action to determine whether there is parent-child immunity.*
>
> \*     \*     \*
>
> *The prerequisite of the wrongful death statute is satisfied here because the injured person, Miranda, could sue her sister.* Further, neither family harmony nor parental discipline can be affected in any way by the litigation because both children are dead. The wrongful death claim arose in the Parents as beneficial plaintiffs the moment the parent-child relationship with Susan, the alleged tortfeasor, terminated.

*Id.* at 648–49 (emphasis added).

The Court next addressed these issues in *Mummert v. Alizadeh,* 435 Md. 207 (2013). In that case, the decedent began to experience symptoms associated with colon cancer in 1997. *Id.* at 211. She discussed the issues with her physician, who failed to order appropriate testing until 2004. *Id.* The decedent was diagnosed with advanced cancer that had metastasized. *Id.* She passed away in 2008. *Id.* Her spouse and her children filed a

32

wrongful death action against the physician in 2011. *Id.* at 210. The physician moved to dismiss the complaint on limitations grounds: he conceded that suit was filed within three years of the decedent's death but asserted that, at the time of her death, an action by the decedent would have been barred by the statute of limitations. *Id.* at 211. The circuit court granted the motion to dismiss. *Id.* at 211–12.

In reversing the judgment, the Court of Appeals concluded: first, that Maryland's wrongful death statute was intended "to create a new and independent cause of action," *id.* at 219; second, the ability to file a wrongful death action "is not contingent on the decedent's ability to file a timely claim before death," *id.* at 223; and third, "[c]onditioning a wrongful death claimant's right to sue on the decedent's ability to file a timely claim before death would lead to an illogical, and absurd result," *id.* at 226.

In reaching these conclusions, the Court distinguished between a limitations defense and other affirmative defenses such as contributory negligence, assumption of risk, and parental immunity. *Id.* at 221. The Court explained that "[t]hose defenses are distinguishable from a statute of limitations defense, however, because, where those defenses apply, the decedent did not have a viable claim from the outset." *Id.* The Court continued "[t]hus, the wrongful death statute's requirement of an act 'which would have entitled the party injured to maintain an action and recover damages if death had not ensued' barred the wrongful death claims in those instances." *Id.* (quoting *Smith*, 319 Md. at 144).

The Court summarized its reasoning thus:

In light of the Legislature's purpose of creating a new and independent cause of action when it passed the Maryland wrongful death statute and the reasoning of many of those courts interpreting similar statutes, we think that, by requiring that a wrongful act be one "which would have entitled the party injured to maintain an action and recover damages if death had not ensued," the Legislature did not intend for a wrongful death action to be barred by expiration of the statute of limitations applicable to the decedent's underlying claim. *Accordingly, we hold that a wrongful death claimant's right to sue is not contingent on the decedent's ability to file a timely negligence claim prior to her death.*

435 Md. at 228 (emphasis added).

Immediately following its pronouncement of its holding, the Court stated:

We recognize that our holding here may conflict or be inconsistent with a few statements made in earlier opinions by this Court (all of which, however, were *dicta*), as well as the case law relied on by the trial court in this case. In *Philip Morris v. Christensen*, 394 Md. 227 (2006), we stated, *in dicta*, that the determination of whether a "wrongful act" existed "is made at the time of the decedent's death." 394 Md. at 268. That statement depended on a footnote in *Smith v. Gross*, 319 Md. 138, where, also in *dicta*, we stated (with understandable equivocation) that "Maryland law *appears* to be that if a decedent could not have brought a cause of action at the time of death, the wrongful death action similarly is precluded." 319 Md. at 143 n. 4. (emphasis added [in *Mummert*]). Because the question in the present case was not central to either of those cases, we did not have then the benefit of extensive briefing and argument by the parties, nor apparently the opportunity or inclination to review the history and purpose of our wrongful death statute before those statements were published.

Moreover, upon considered reflection of the case law, we conclude that the statement included in footnote 4 of *Smith*, and later appropriated in *Philip Morris*, was unfounded at the time of its adoption. . . .

To the extent that our statements in *Philip Morris v. Christensen* and *Smith v. Gross* **appear inconsistent or in conflict with our holding in the present case, they are disavowed.**

*Id.* at 228–30 (italicized language in original; bold emphasis added).

34

The Court of Appeals addressed *Mummert's* relationship to *Smith v. Gross* and *Eagan v. Calhoun* in *Spangler III*. The Court reiterated that, in the context of wrongful death actions, there were "defenses which generally bar subsequent actions, such as contributory negligence, assumption of the risk, parental immunity, and lack of privity of contract, were distinguishable from the statute of limitations at issue, because where the former defenses applied, '*the decedent did not have a viable claim from the outset.*'" *Spangler III*, 449 Md. at 44 (quoting *Mummert*, 435 Md. at 221) (emphasis in original).

Returning to the case before us, Ms. Grier argues that reliance on *Smith v. Gross* "is misplaced because it was abrogated in *Mummert.*" We do not agree. *Mummert* "disavowed" any statement in *Smith v. Gross* that "appear[s] inconsistent or in conflict with our holding in the present case[.]" *Mummert*, 435 Md. at 230. The holding in *Mummert* was that "a wrongful death claimant's right to sue is not contingent on the decedent's ability to file a timely negligence claim prior to her death." 435 Md. at 228. Limitations was not an issue in *Smith v. Gross.* The relevant holding in that case was that parent-child immunity bars recovery in cases where a child dies because of a parent's negligent conduct. In *Mummert*, the Court distinguished between a statute of limitations defense (which would not bar a claim by a decedent against a tortfeasor had the decedent survived) and defenses such as immunity and contributory negligence (which would bar such a claim). 435 Md. at

35

221. The Court also took care to point out the same distinction in *Spangler III.* 449 Md. at 44.[25]

Ms. Grier also argues that parent-child immunity is inapplicable in this case because, after Michaelangelo's death, "there [was] no longer any parental right to be exercised." However, in *Smith v. Gross*, the parental relationship between the father and the child ended when the child died as a result of the parent's negligence. The Court held that parent-child immunity barred the wrongful death claim. We do not see how the present case can be distinguished from *Smith v. Gross* in this regard.

Ms. Grier's argument as to why her survival claim should proceed is based exclusively upon her contention that Maryland should abrogate parent-child immunity in its entirety. As we have explained, we do not agree with her reasoning on that issue. We have also concluded that it is inappropriate for us to abrogate the doctrine in a wrongful death action. For the same reasons, we decline to abrogate the doctrine in survival claims.

**THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**

---

[25] In the context of the Uniform Contribution Among Tortfeasors Act, Md. Code, Courts & Jud. Proc. § 3-1401 *et seq.*, the Court has noted that "family immunity" is one of the defenses "arising from the moment of the wrongdoing which preclude[] legal responsibility to the injured party" and that such defenses "act as a complete bar to recovery[.]" *Gables Construction, Inc. v. Red Coats, Inc.*, 468 Md. 632, 662–63 (2020), (citing *Montgomery County v. Valk Mfg. Co.*, 317 Md. 185, 199 (1989)).

Circuit Court for Howard County
Case No.: 13-C-17-113797

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2523

September Term, 2019

CLAUDIA GRIER, ET AL.

v.

TIMOTHY HEIDENBERG

Kehoe,
Arthur,
Reed,

JJ.

Concurring Opinion by Arthur, J.

_____

Filed:  September 1, 2022

I join the majority opinion in every respect but one: I disagree with the statement (Slip Op. at 28) that "societal mores, expectations, and values" have not "changed sufficiently since 2001" for a court "to abrogate the doctrine of parent-child immunity in its entirety." If it were my decision, which it is not in view of *stare decisis* and the limits on our power as an intermediate appellate court, I would abrogate the doctrine in order to permit a recovery in this case.